**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| CAROL J. DELGADO, | ) | Case No. 20-08603 |
| | ) | |
| Debtor. | ) | Hon. Deborah L. Thorne |
| | ) | |
| GINA B. KROL, as chapter 7 Trustee for the estate of Carol J. Delgado, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CAROL J. DELGADO; BRENT D. HOUCK; JAY DELGADO; JANAYE DELGADO; NICHOLAS DELGADO; OUTSOURCE SERVICES LLC; ELLSWORTH INVESTMENT GROUP LLC; RAMCO HOLDINGS LLC | ) | Adv. No. 22-00153 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TEMPORARY RESTRAINING ORDER**

THIS MATTER COMING TO BE HEARD upon the *Trustee's Motion for Entry of Temporary Restraining Order* (the "Motion") of Plaintiff Gina B. Krol, not individually, but as the chapter 7 trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Carol J. Delgado (the "Debtor"),

IT IS HEREBY FOUND AND DETERMINED PURSUANT TO RULE 52 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AS MADE APPLICABLE BY RULE 7052 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, THAT:

A.      A temporary restraining order to preserve and prevent the dissipation of assets held by the above-captioned Defendants is appropriate under Rule 65 of the Federal Rules of Civil

Procedures (the "Rules"), as made applicable by Rule 7065 of the <u>Federal Rules of Bankruptcy Procedure (the</u> "Bankruptcy Rules"), and § 105(a) of title 11 of the United States Code, <u>11 U.S.C. §§ 101–1532</u> (the "Bankruptcy Code").

B.      The Trustee and the Estate will likely suffer irreparable harm in the absence of a temporary restraining order to preserve and prevent the dissipation of the Defendants' assets. There is a real and substantial risk, especially in light of the Defendants' pre- and post-petition conduct (including, for example, their diversion of rental income generated by the Debtor's investment properties to Outsource, Jay Delgado, and Janaye Delgado), that the Defendants will dissipate the property and funds at issue in this Adversary Proceeding as well as other property. Any such dissipation likely would frustrate the Court's ability to grant effective equitable relief in this Adversary Proceeding and also the Trustee's ability to collect on any monetary judgment obtained against the Defendants, which in turn would hinder the administration of the Debtor's estates and diminish the ultimate distributions to the Debtor's creditors.

C.      The Trustee does not have an adequate remedy at law and preliminary equitable relief is appropriate under the present circumstances. The Complaint seeks various forms of equitable relief, including an equitable accounting. Money damages alone likely would not be able to afford the Trustee and the Estate complete and effective final relief in this Adversary Proceeding, and money damages likely would be insufficient to correct changes in the status quo. Moreover, under the circumstances, the Court finds that the Defendants will likely attempt to hide or otherwise dissipate their assets in an effort to avoid any recovery by the Trustee, whether at law or in equity, for the benefit of the Estate.

D.      The Trustee has a reasonable likelihood of success on the merits of the claims alleged in the Complaint.  Based on the Motion and moving papers and the factual allegations in

the Complaint, the Court finds it reasonably likely that the Trustee will prevail on her claim for an equitable accounting because, among other things: (a) it is reasonably likely that the Debtor breached her fiduciary duties to the Estate as debtor-in-possession, including by fraudulently diverting and concealing rents owed to the Estate and concealing information regarding her financial affairs; (b) there is a need for discovery due to the Defendants' ongoing failure to comply with their respective obligations under this Court's prior orders; (c) it is reasonably likely that the Defendants are engaged in a conspiracy to fraudulently divert and conceal assets; and (d) the transactions and accounts at issue in the Trustee's accounting claim are highly complex.

E. The balance of the hardships favors the Trustee, and any potential harm to other parties or the public do not sufficiently outweigh the interests of the Trustee to counsel against granting preliminary injunctive relief. As the Court finds above, the Trustee and the Estate likely will suffer significant and irreparable harm without a preliminary injunction in this Adversary Proceeding. By contrast, preventing the Defendants from dissipating assets and requiring them to begin preparing an accounting will not place an undue burden on the Defendants or the general public under these circumstances. Moreover, any hardship to the Defendants is more than outweighed by the benefits to the Estate and its prompt administration.

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS HEREBY ORDERED AS OF OCTOBER 4, 2022 at 1:00 P.M. (CENTRAL TIME) THAT:

1. For the period of OCTOBER 4, 2022 through OCTOBER 18, 2022, each Defendant shall be RESTRAINED and ENJOINED from taking any of the following actions:

   (a) transferring, disposing of, encumbering, or secreting any accounts, money or other property held in any financial account for which any Defendant is an owner or authorized signatory.

(b) transferring, encumbering, or otherwise disposing of any interest in property, or from incurring any obligation, to or for the benefit of any other Defendant or Insider.[1]

(c) opening, closing, or changing ownership or control over any financial account;

(d) forming, dissolving, or changing ownership or control over any corporate or trust entity;

(e) destroying, removing, or rendering unavailable any physical or electronic documents, records, or communications;

(f) receiving, or attempting to collect, any rents or other income generated by the Regan Property, Tammy Property, or Ellsworth Property (each as more fully described on Exhibit A to this Order);

(g) coming within a quarter-mile radius of the Regan Property, Tammy Property, or Ellsworth Property;

(h) interfering with or attempting to interfere with the Trustee's efforts to sell the Regan Property, Tammy Property, or Ellsworth Property; and

(i) causing any Insider to take any of the foregoing enjoined actions.

2.     Within one (1) day after entry of this Temporary Restraining Order, the Trustee will use good faith efforts to cause copies of this Temporary Restraining Order to be personally served on the Defendants and to be sent to their respective last known email addresses, and within a reasonable time thereafter will file appropriate proof of service.

3.     The Trustee may serve copies of this Temporary Restraining Order, as if serving a summons and complaint pursuant to Bankruptcy Rule 7004, on any other persons, entities, and institutions on whom service of this Temporary Restraining Order may be necessary or appropriate, including, but not limited to, all persons, entities, and institutions the Trustee

---

[1] As used herein, the term "Insider" refers to each of the following: (a) any family member of any Defendant, (whether by blood or marriage); and (b) any corporate or trust entity directly or indirectly owned or controlled at any point within the past ten years by any Defendant, or by any family member of any Defendant; and (c) any current or former owner, manager, director, officer, employee, attorney, or agent of any such corporate or trust entity.

reasonably and in good faith believes might: (a) be an Insider; (b) might be in active concert or participation with any Defendant; or (c) hold any property of or on behalf of any Defendant or might owe any debt or other obligation to any Defendant, and within a reasonable time thereafter will file appropriate proof of service.

4.      Upon receiving actual notice of this order under Fed. R. Civ. P. 65(d)(2), any banks, savings and loan associations, payment processors, PayPal, Venmo, or other financial institutions shall within two (2) business days: (a) locate all accounts connected to any Defendant; (b) restrain and enjoin such accounts from transferring or disposing of any money or other assets; and (c) provide the Trustee's counsel with copies of all monthly statements for any such accounts.

5.      Pursuant to Bankruptcy Rule 7065, the Trustee is excused from complying with the requirement of Rule 65(c) to post security for this Temporary Restraining Order to be issued.

6.      On or before November 4, 2022, the Defendants shall file and serve a full and complete chronological accounting, from January 1, 2016 to date on which the accounting is filed (the "**Accounting Period**"), certified by each Defendant under penalty of perjury, that includes each of the following components (together, the "**Accounting**"):

(i)     a complete listing of each corporate or trust entity that is or was at any point after January 1, 2015 owned, managed, or controlled by any Defendant or Insider (whether directly, indirectly, completely, partially, or otherwise) (the "**Insider Entities**") supported by legible copies of the governing documents for each such entity;

(ii)    a complete listing of each financial account for which any Defendant or any Insider Entity is or was an account holder or authorized signatory at any point during the Accounting Period, supported by legible copies of all monthly statements for each such account during the Accounting Period;

(iii)    a complete and chronological accounting of all transfers of money or other property during the Accounting Period among[2] any Defendant or Insider Entity and any other Defendant or Insider Entity, and any subsequent transfer(s) thereof, supported by legible copies of any and all available supporting documentation, including but not limited to, cancelled checks; bills; invoices; receipts; bank and other statements; ledgers; computer printouts; memoranda; communications; and all other tangible evidence relating thereto; and

(iv)    a complete and chronological accounting of all receipts of money or other property during the Accounting Period by any Defendant or any Insider Entity from any current, former, or prospective tenant of the Regan Property, Ellsworth Property, or Tammy Property (or from a third party on behalf of any such person), and any subsequent transfer(s) thereof, supported by legible copies of any and all available supporting documentation, including but not limited to, leases; cancelled checks; bills; invoices; receipts; bank and other statements; ledgers; computer printouts; memoranda; communications; and all other tangible evidence related thereto; and

(v)    A complete and chronological accounting of all receipts of money or other property during the Accounting Period by any Defendant or any Insider Entity from any third party on account of any "Receivable" contemplated by the Receivables Purchase Agreements attached to this Order as <u>Exhibit B</u>, and any subsequent transfer(s) thereof, supported by legible copies of any and all available supporting documentation, including but not limited to, leases; cancelled checks; bills; invoices; receipts; bank and other statements; ledgers; computer printouts; memoranda; communications; and all other tangible evidence related thereto.

7.    The Defendants' obligations under paragraph 6 shall survive the expiration or termination of this Temporary Restraining Order and shall continue in effect unless otherwise ordered by the Court.

8.    This matter is set for a trial on the merits of Counts I, IV, V, VI and VII of the Trustee's Complaint on November 15, 2022 at 11:00 a.m. Pursuant to <u>Federal Rule of Civil Procedure 65(a)(2)</u>, the Trustee may present any supplemental motion or brief seeking preliminary injunctive relief at that hearing. The Trustee may file briefs up to twenty-five pages in length in connection with this adversary proceeding.

---

[2] As used herein, the term "among" includes each of the following: "to," "from," "to or from a third party for the benefit of," and "to or from a third party on behalf of."

9.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Temporary Restraining Order, including the authority to impose sanctions on any person or entity that violates this Temporary Restraining Order.

Date: October 4, 2022

ENTERED:

_____
Honorable Deborah L. Thorne
United States Bankruptcy Judge

*Prepared by:*

Ronald R. Peterson (2188473)
William A. Williams (6321738)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
TEL: 312-222-9350

Special Counsel for the Trustee

## EXHIBIT A
### (Property Descriptions)

1.  13043 W. Regan Road Mokena, Illinois 60448 (PIN: 15-08-11-200-045-0000) (the "**Regan Property**"), described as follows:

    PARCEL 1:

    THE NORTH 605 FEET OF THE WEST 120 FEET OF THE EAST 480.00 FEET OF THAT PART OF THE WEST 1/2 OF THE NORTHEAST 1/4 OF SECTION 11, TOWNSHIP 35 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING SOUTH OF THE SOUTH RIGHT OF WAY LINE OF REGAN ROAD, IN WILL COUNTY, ILLINOIS.

    PARCEL 2:

    THAT PART OF THE WEST 1/2 OF THE NORTHEAST 1/4 OF SECTION 11, TOWNSHIP 35 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS BEGINNING AT THE SOUTHWEST CORNER OF THE NORTH 605 FEET OF THE WEST 120 FEET OF THE EAST 480 FEET OF THAT PART OF SAID WEST 1/2 LYING SOUTH OF THE SOUTH RIGHT OF WAY LINE OF REGAN ROAD; THENCE NORTH 89 DEGREES 54 MINUTES 57 SECONDS EAST, ALONG THE SOUTH LINE OF SAID NORTH 605 FEET, 120.01 FEET, TO THE EAST LINE OF SAID WEST 120 FEET; THENCE SOUTH 00 DEGREES 41 MINUTES 33 SECONDS EAST, ALONG SAID EAST LINE 396.00 FEET; THENCE SOUTH 89 DEGREES 54 MINUTES 57 SECONDS WEST, PARALLEL WITH THE SOUTH LINE OF SAID NORTH 605 FEET, 172.60 FEET; THENCE NORTH 06 DEGREES 52 MINUTES 57 SECONDS EAST, 398.92 FEET TO THE POINT OF BEGINNING, ALL IN WILL COUNTY, ILLINOIS.

2.  119 S. Ellsworth St., Naperville, Illinois 60540 (PIN: 08-18-313-015 & 08-18-313-016 (the "**Ellsworth Property**"), described as follows:

    THE NORTHERLY 15 FEET OF LOTS 1, 2 AND 3 OF THE SOUTH 30 FEET OF LOT 4 IN BLOCK 3 OF SLEIGHT'S ADDITION TO NAPERVILLE, A SUBDIVISION OF PART OF THE SOUTHWEST QUARTER OF SECTION 18, TOWNSHIP 38 NORTH, RANGE 10, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN DUPAGE COUNTY, ILLINOIS.

3.   18748 Tammy Drive, Mokena, Illinois 60448 (PIN: 15-08-02-310-007-0000) (the
     "**Tammy Property**"), described as follows:

     LOT 47 IN UNIT 1 OF WILLA-BROOK, BEING A SUBDIVISION OF PART
     OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF
     SECTION 2, TOWNSHIP 35 NORTH, RANGE 11, EAST OF THE THIRD
     PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF
     RECORDED NOVEMBER 10, 1970 AS DOCUMENT NO. R70- 20639, IN
     WILL COUNTY, ILLINOIS.

**EXHIBIT B**
**(Receivables Purchase Agreements)**

# RECEIVABLES PURCHASE AGREEMENT

THIS RECEIVABLES PURCHASE AGREEMENT, dated as of the 2nd day of September, 2016 is by and between Renewable Asset Management Company, LLC, ("Originator"), and RAMCO Holdings, LLC ("Buyer"). Unless defined elsewhere herein, capitalized terms used in this Agreement shall have the meanings assigned to such terms in Exhibit I.

## PRELIMINARY STATEMENT

Originator now owns, and from time to time hereafter will own, Receivables. Originator and Buyer are both finance companies whereby in the course of ordinary business, receivables are procured, monitored, serviced and or sold. Receivables are the inventory by which said finance companies do business. Said Receivables are currently encumbered by an unconditional first priority security interest by The Private Bank and Trust (the Lien). Originator wishes to sell and assign to Buyer, and Buyer wishes to purchase from Originator, all of Originator's right, title and interest in and to such Receivables, together with the Related Security and Collections with respect thereto.

## ARTICLE I
## AMOUNTS AND TERMS

Section 1.1 Purchase of Receivables.

(a) Effective on the date hereof, in consideration for the Purchase Price and upon the terms and subject to the conditions set forth herein, Originator does hereby sell, assign, transfer, set-over and otherwise convey to Buyer on a non-serviced basis, without recourse (except to the extent expressly provided herein) and without regard to collectability, and Buyer does hereby purchase from Originator, all of Originator's right, title and interest in and to all Receivables which are existing as of the close of business on the Business Day immediately prior to the date hereof and; provided, that, Buyer shall be obligated to pay the Purchase Price therefor in accordance with Section 1.2. In connection with the payment of the Purchase Price for any Receivables purchased hereunder, Buyer may request that Originator deliver, and Originator shall deliver, such approvals, opinions, information, reports or documents as Buyer may reasonably request.

(b) It is the express intent of the parties hereto that the Purchase of the Receivables made hereunder shall constitute an absolute sale of the Receivables sold under this Agreement by Originator to Buyer and the beneficial interest in and title to the Receivables and the Related Security shall not be part of Originator's estate in the event of any bankruptcy or insolvency proceeding by or against Originator under any bankruptcy or insolvency law. Except for the Purchase Price Credits owed pursuant to Section 1.3, the sale of Receivables hereunder is made without recourse to Originator; provided, however, that (i) Originator shall be liable to Buyer for all representations, warranties and covenants made by Originator pursuant to the terms of

1

the Transaction Documents to which Originator is a party, and (ii) such sale does not constitute and is not intended to result in an assumption by Buyer or any assignee thereof of any obligation of Originator or any other Person arising in connection with the Receivables and/or the Related Security or any other obligations of Originator.

Section 1.2 Payment for the Purchase.

(a) The Purchase Price for the Purchase of Receivables which are in existence on the close of business on the Business Day immediate preceding the date hereof (the "Initial Cutoff Date") shall be $7,000,000.00 and be payable in full by Buyer to Originator on December 30, 2016, (Balloon Payment), and shall be paid at closing with first satisfaction of The Private Bank and Trust's first priority lien, with the remainder to Originator or to whom Originator assigns.

(b) The Purchase Price for each Receivable coming into existence after the Initial Cutoff Date shall be due and owing in full by Buyer to Originator or its designee on the date each such Receivable came into existence and shall be paid to Originator in the manner provided in the following paragraph (c).

(c) Although the Purchase Price for each Receivable coming into existence after the date hereof shall be due and payable in full by Buyer to Originator on the date such Receivable came into existence, and although Buyer intends in the ordinary course to remit to Originator on a daily basis amounts (to the extent available therefor under the Purchase Agreement) from collections on the Receivables for application to the Purchase Price obligation then outstanding, settlement of the Purchase Price between Buyer and Originator shall be effected on a monthly basis on each Settlement Date with respect to all Receivables coming into existence during the same Calculation Period as reported by Originator to Buyer, and Buyer shall pay to Originator in immediately available funds the aggregate Purchase Price owing with respect to such Receivables which remains outstanding on such Settlement Date.

Section 1.3 Transfer of Records.

(a) In connection with the Purchase of Receivables hereunder, Originator hereby sells, transfers, assigns and otherwise conveys to Buyer all of Originator's right and title to and interest in the Records relating to all Receivables sold hereunder, without the need for any further documentation in connection with the Purchase. In connection with such transfer, Originator hereby grants to the Buyer (and authorizes the Buyer to grant to the Agent) and the Servicer an irrevocable, non-exclusive license to use, without royalty or payment of any kind, all software used by Originator to account for the Receivables, to the extent necessary to administer the Receivables, whether such software is owned by Originator or is owned by others and used by Originator under license agreements with respect thereto, provided that should the consent of any licensor of Originator to such grant of the license described herein be required, Originator hereby agrees that upon the request of Buyer (or the Agent as Buyer's assignee), such consent shall be a condition to the grant of the foregoing license with

2

respect to the applicable software and Originator will use its reasonable efforts to obtain the consent of such third-party licensor. The license granted hereby shall be irrevocable, and shall terminate on the date this Agreement terminates in accordance with its terms.

(b) Originator (i) shall take such action requested by Buyer and/or the Agent (as Buyer's assignee), from time to time hereafter, that may be necessary or appropriate to ensure that Buyer and its assigns under the Purchase Agreement have an enforceable ownership interest in the Records relating to the Receivables purchased from Originator hereunder, and (ii) shall use its reasonable efforts to ensure that Buyer, the Agent and the Servicer each has an enforceable right (whether by license or sublicense or otherwise) to use all of the computer software used to account for the Receivables and/or to recreate such Records

Section 1.4 Reconveyance of Receivables on Termination Date.

On the Termination Date, Buyer hereby reassigns to Originator for $1.00, free and clear of any Adverse Claim on the part of Buyer or any assignee of Buyer, all of Buyer's right, title and interest in and to the Receivables, Related Security, any Collections, any Records, Contracts and other rights and documents relating thereto that are originated on or after the Termination Date, which for greater certainty shall be deemed to be Reconveyed Assets, and Buyer and Originator shall promptly execute and deliver all instruments and documents and take all actions necessary, including without limitation any recording, filing or registration, to evidence and give effect to such reassignment. Buyer grants to Originator a power of attorney, coupled with an interest, to act as its attorney for the purpose of doing anything which Buyer may lawfully do by attorney solely for the purpose of effecting any reassignment of Receivables, Related Security, any Collections, any Records, Contracts and other rights and documents relating thereto to be effected in accordance with this Section 1.6.

Section 1.5 Re-characterization.

If the sale of Receivables hereunder is re-characterized as a secured loan and not a sale or if such sale shall for any reason be ineffective or unenforceable, each of the Originator and the Buyer represents and warrants as to itself that each remittance of Collections by the Originator to the Buyer hereunder will have been (i) in payment of a debt incurred by the Originator in the ordinary course of business or financial affairs of the Originator and the Buyer and (ii) made in the ordinary course of business or financial affairs of the Originator and the Buyer.

Section 1.6 Reconveyed Assets.

Notwithstanding anything contained in this Agreement, following the reconveyance of any Reconveyed Assets, the relevant Reconveyed Assets shall be deemed not to form part of the Receivables, Related Security, Collections, Records, Contracts or other rights and documents relating to such Reconveyed Assets sold, transferred assigned to the Buyer or in respect of which other rights were assigned to the Buyer under this Agreement.

3

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Section 2.1 <u>Representations and Warranties of Originator</u>. Originator hereby represents and warrants to Buyer that:

(a) <u>Corporate Existence and Power</u>. Originator is (1) a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and (2) is duly qualified to do business and is in good standing as a foreign corporation (other than in its jurisdiction of incorporation) and has and holds all corporate power and all governmental licenses, authorizations, consents and approvals required to carry on its business in each jurisdiction in which its business is conducted, except in the case of (2) to the extent that any failure to do so could not be reasonably expected to have a Material Adverse Effect.

(b) <u>Power and Authority; Due Authorization Execution and Delivery</u>. The execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party, and the performance of its obligations hereunder and thereunder, and Originator's use of the proceeds of the Purchase made hereunder, are within its corporate powers and authority and have been duly authorized by all necessary corporate action on its part. This Agreement and each other Transaction Document to which Originator is a party has been duly executed and delivered by Originator.

(c) <u>No Conflict</u>. The execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party, and the performance of its obligations hereunder and thereunder do not contravene or violate (i) its certificate or articles of incorporation or by-laws (or equivalent organizational documents), (ii) any law, rule or regulation applicable to it, (iii) any restrictions under any agreement, contract or instrument to which it is a party or by which it or any of its property is bound, or (iv) any order, writ, judgment, award, injunction or decree binding on or affecting it or its property, and do not result in the creation or imposition of any Adverse Claim on assets of Originator (except as created by the Transaction Documents); and no transaction contemplated hereby requires compliance with any bulk sales act or similar law.

(d) <u>Governmental Authorization</u>. Other than the filing of the financing statements required hereunder, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party and the performance of its obligations hereunder and thereunder.

4

(e) <u>Actions, Suits</u>. Both Originator and Buyer are well informed of pending litigation between Originator and The Private Bank and Trust, and the terms of this agreement, and upon payment pursuant to 1.2(a), The Private Bank and Trust shall be paid in full and it is anticipated a Release will be tendered by said bank.

(f) <u>Binding Effect</u>. This Agreement and each other Transaction Document to which Originator is a party constitute the legal, valid and binding obligations of Originator enforceable against Originator in accordance with their respective terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(g) <u>Accuracy of Information</u>. All information heretofore furnished by Originator or any of its Affiliates to Buyer (or its assigns) for purposes of or in connection with this Agreement, any of the other Transaction Documents or any transaction contemplated hereby or thereby is, and all such information hereafter furnished by Originator or any of its Affiliates to Buyer (or its assigns) will be, true and accurate in every material respect on the date such information is stated or certified and does not and will not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not misleading.

(h) <u>Use of Proceeds</u>. No proceeds of the Purchase hereunder will be used for a purpose that violates, or would be inconsistent with any existing laws.

(i) <u>Good Title</u>. Immediately prior to the transfer hereunder of any Receivable, Originator shall be the legal and beneficial owner of each such Receivables and Related Security with respect thereto, free and clear of any Adverse Claim, except as created by the Transaction Documents and the acknowledged first priority security interest of the Lien. There have been duly filed all financing statements or other similar instruments or documents, if any, necessary to perfect Originator's ownership interest in each Receivable, its Collections and the Related Security.

(j) <u>Payments to Originator</u>. With respect to each Receivable transferred to Buyer hereunder, the Purchase Price to be paid to Originator by Buyer constitutes approximately the fair market value in consideration therefor and the terms of this Agreement are consistent with the terms that would be obtained in an arm's length sale, and such transfer was not made for or on account of an antecedent debt.

(k) <u>Enforceability of Contracts</u>. Each Contract with respect to each Receivable is effective to create, and has created, a legal, valid and binding obligation of the related Obligor to pay the Outstanding Balance of the Receivable created thereunder and any accrued interest thereon, enforceable against the Obligor in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a

proceeding in equity or at law).

(l) <u>Eligible Receivables</u>. Each Receivable included in the Net Receivables Balance as an Eligible Receivable on the date it came into existence was an Eligible Receivable on such date.

(m) <u>Accounting</u>. The manner in which Originator will account for the transactions contemplated by this Agreement is not inconsistent with the characterization or treatment of each transfer hereunder as having the effect of a true sale.

ARTICLE III
CONDITIONS OF PURCHASE

Section 3.1 <u>Conditions Precedent to Purchase</u>. The Purchase under this Agreement is subject to the conditions precedent that all of the conditions to the initial purchase under the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

Section 3.2 <u>Conditions Precedent to Subsequent Transfers and Payments</u>. Originator's obligation to transfer and Buyer's obligation to pay for Receivables coming into existence after the date hereof shall be subject to the further conditions precedent that (a) the Termination Date shall not have occurred; and (b) Buyer (or its assigns) shall have received such other approvals, opinions or documents as it may reasonably request.

ARTICLE IV
TERMINATION EVENTS

Section 4.1 <u>Termination Events</u>. The occurrence of any one or more of the following events shall constitute a Termination Event:

(a) Originator or Buyer shall fail (i) to make any payment or deposit required hereunder when due, or (ii) to perform or observe any term, covenant or agreement hereunder (other than as referred to in clause (i) of this paragraph (a)) or any other Transaction Document to which it is a party, and such failure shall continue for five (5) consecutive Business Days.

(b) Any representation, warranty, certification or statement made by Originator in this Agreement, any other Transaction Document or in any other document delivered pursuant hereto or thereto shall prove to have been incorrect in any material way when made or deemed made. Notwithstanding the foregoing, a breach of any representation or warranty which relates solely to the eligibility or characteristics of any Receivable shall not constitute a Termination Event hereunder if a Purchase Price Credit Adjustment (and any related payment by Originator) is duly and timely made in accordance with <u>Section 1.3</u> hereof.

6

(c) Failure of Buyer or any of its Subsidiaries or Affiliates to pay the purchase price as indicated, or the default by Originator or any of its Subsidiaries or Affiliates in the performance of any term, provision or condition contained in any agreement under which any such Indebtedness was created or is governed, the effect of which is to cause, or to permit the holder or holders of such Indebtedness to cause, such Indebtedness to become due prior to its stated maturity; or any such Indebtedness of Originator or any of its Subsidiaries or Affiliates shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled payment) prior to the date of maturity thereof.

(d) (i) Originator or any of its Subsidiaries or Affiliates shall generally not pay its debts as such debts become due or shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Originator or any of its Subsidiaries or Affiliates seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or any substantial part of its property, <u>provided</u>, that in the case of an involuntary proceeding instituted against Originator or any of its Subsidiaries or Affiliates, the Termination Date shall not occur or be declared for 60 days after such proceeding is instituted unless Originator shall at any time during such period consent to or acquiesce in the continuance or maintenance of such proceeding or (ii) Originator or any of its Affiliates shall take any corporate action to authorize any of the actions set forth in the foregoing clause (i) of this subsection (d).

(e) A Change of Control shall occur.

(f) Any cause of action is initiated against the Buyer, and or one or more final judgments for the payment of money shall be entered against Originator.

(g) Termination of the Purchase Agreement in accordance with its terms.

        Section 4.2 <u>Remedies</u>.

        Upon the occurrence and during the continuation of a Termination Event, Buyer may take any of the following actions: (i) declare (by notice to Originator) the Termination Date to have occurred, whereupon the Termination Date shall forthwith occur, without demand, protest or further notice of any kind, all of which are hereby expressly waived by Originator; <u>provided</u>, <u>however</u>, that upon the occurrence of Termination Event described in <u>Section 4.1(d)</u> (subject to the proviso therein), or of an actual or deemed entry of an order for relief with respect to Originator under any applicable law relating to bankruptcy, insolvency or reorganization or relief of debtors, the Termination Date shall automatically occur, without demand, protest or any notice of any kind, all of which are hereby expressly waived by Originator and (ii) to the fullest extent permitted by applicable law, declare that the Default Fee shall accrue with respect

to any amounts then due and owing by Buyer to Originator. The aforementioned rights and remedies shall be in addition to all other rights and remedies of Buyer and its assigns available under this Agreement, by operation of law, at equity or otherwise, all of which are hereby expressly preserved, including, without limitation, all rights and remedies provided, all of which rights shall be cumulative.

## ARTICLE V
## INDEMNIFICATION

Section 5.1 Indemnities by Originator.

Without limiting any other rights that Buyer may have hereunder or under applicable law, Originator hereby agrees to indemnify Buyer and its assigns (including, without limitation, the Purchasers and the Agent), officers, directors, agents and employees (each an "Indemnified Party") from and against any and all damages, losses, claims, taxes and liabilities, reasonable costs and expenses and for all other amounts payable, including reasonable attorneys' fees (which attorneys may be employees of Buyer) and disbursements (all of the foregoing being collectively referred to as "Indemnified Amounts") awarded against or incurred by any of them arising out of or as a result of this Agreement or the acquisition, either directly or indirectly, by Buyer of an interest in the Receivables pursuant to this Agreement. Accordingly, without limiting the generality of the foregoing indemnification, Originator shall indemnify Buyer for Indemnified Amounts relating to or resulting from:

(i) any representation or warranty made by Originator (or any officers of Originator) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered by Originator pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

(ii) the failure by Originator, to comply with any applicable law, rule or regulation with respect to any Receivable or Contract related thereto, or the nonconformity of any Receivable or Contract included therein with any such applicable law, rule or regulation or any failure of Originator to keep or perform any of its obligations, express or implied, with respect to any Contract;

(iii) any failure of Originator to perform its duties, covenants or other obligations in accordance with the provisions of this Agreement or any other Transaction Document;

(iv) any products liability or similar claim arising out of or in connection with merchandise, insurance or services that are the subject of any Contract;

(v) any dispute, claim, offset or defense (other than discharge in bankruptcy of the Obligor) of the Obligor to the payment of any Receivable (including, without limitation, a defense based on such Receivable or the related Contract not being a legal, valid and binding obligation of such Obligor enforceable against it in accordance with its terms), or any other claim resulting from the sale of the merchandise or service related to such

8

Receivable or the furnishing or failure to furnish such merchandise or services, in any such case either (i) as a result of any event, fact or circumstance that arose or existed at a time before such Receivable was purchased by Buyer, or (ii) at any time after such purchase, resulting from any action taken by Originator, or any failure to act by Originator where required, with respect to such Receivable;

(vi) the commingling of Collections of Receivables at any time with other funds;

(vii) any investigation, litigation or proceeding related to (i) this Agreement or any of the other Transaction Documents as a result of Originator's participation therein, (ii) the use of proceeds of sales by Originator, (iii) the ownership of the Receivables by Originator prior to their sale to Buyer or, (iv) the ownership of the Receivables by Buyer after the purchase thereof by Buyer and resulting from any action by Originator, or any failure to act by Originator where required;

(viii) any inability to litigate any claim against any Obligor in respect of any Receivable as a result of such Obligor being immune from civil and commercial law and suit on the grounds of sovereignty or otherwise from any legal action, suit or proceeding, in each case as a result of circumstances that existed on or prior to the date of purchase of such Receivable by Buyer;

(ix) any Termination Event as described herein;

(x) the failure to vest in Buyer at the time of Balloon payment to Buyer a first priority, perfected ownership interest in the Receivables, the Related Security and the Collections, free and clear of any Adverse Claim (except as created by the Transaction Documents and except in respect of Permitted Liens);

(xi) any action or omission by Originator which reduces or impairs the rights of Buyer with respect to any Receivable or the value of any such Receivable (unless taken in accordance with the Transaction Documents);

(xii) any attempt by any Person to void the Purchase hereunder under statutory provisions or common law or equitable action; and

(xiii) the failure to pay when due any taxes which are Originator's responsibility to pay, including without limitation, sales, excise or personal property taxes payable in connection with the Receivables.

Notwithstanding anything contained herein to the contrary, Originator shall have no obligation to indemnify any Indemnified Party from and against:

(i) Indemnified Amounts to the extent a final judgment of a court of competent jurisdiction holds that such Indemnified Amounts resulted from gross negligence or willful misconduct on the part of the Indemnified Party seeking indemnification;

9

(ii) Indemnified Amounts to the extent the same include losses in respect of Receivables that are uncollectible on account of the insolvency, bankruptcy, lack of creditworthiness or failure to pay of or by the related Obligor; or

(iii) taxes imposed by the jurisdiction in which such Indemnified Party's principal executive office is located, on or measured by the overall net income of such Indemnified Party to the extent that the computation of such taxes is consistent with the U.S. Tax Characterization.

Section 5.2 <u>Other Costs and Expenses</u>. Originator shall pay to Buyer on demand all costs and out-of-pocket expenses in connection with the preparation, execution, delivery and administration of this Agreement, the transactions contemplated hereby and the other documents to be delivered hereunder. Originator shall pay to Buyer on demand any and all costs and expenses of Buyer, if any, including reasonable counsel fees and expenses in connection with the enforcement of this Agreement and the other documents delivered hereunder and in connection with any restructuring or workout of this Agreement or such documents, or the administration of this Agreement following a Termination Event.

## ARTICLE VI
## ADMINISTRATION AND COLLECTION

Section 6.1 <u>Collection Accounts</u>. Originator hereby transfers to Buyer the exclusive ownership and control of each Lock-Box and Collection Account owned by it, provided that, where consented to by Buyer. Originator hereby authorizes Buyer, and agrees that Buyer shall be entitled to (i) endorse Originator's name on checks and other instruments representing Collections, (ii) enforce the Receivables and the Related Security (including the related Contracts insofar as the collection of Receivables is concerned) and (iii) take such action as shall be necessary or desirable to cause all cash, checks and other instruments constituting Collections of Receivables to come into the possession of Buyer.

Section 6.2 <u>Responsibilities of Originator</u>. Anything herein to the contrary notwithstanding, the exercise by Buyer (or its assignees) of its rights hereunder shall not release Originator from any of its duties or obligations with respect to any Receivables or under the related Contracts or Invoices, including the payment when due of any taxes payable in connection with its performance under the Contracts relating to the Receivables. Buyer shall have no obligation or liability with respect to any Receivables or related Contracts or Invoices, nor shall Buyer be obligated to perform the obligations of Originator.

ARTICLE VII
MISCELLANEOUS

Section 7.1 Waivers and Amendments.

(a) No failure or delay on the part of Buyer (or its assigns) in exercising any power, right
or remedy under this Agreement shall operate as a waiver thereof, nor shall any single
or partial exercise of any such power, right or remedy preclude any other further
exercise thereof or the exercise of any other power, right or remedy. The rights and
remedies herein provided shall be cumulative and nonexclusive of any rights or
remedies provided by law. Any waiver of this Agreement shall be effective only in
the specific instance and for the specific purpose for which given.

(b) No provision of this Agreement may be amended, supplemented, modified or waived
except in writing signed by Originator and Buyer.

(c) Buyer shall provide prior written notice to Originator of any amendments or waivers
to the Purchase Agreement that may affect any rights and obligations of Originator
hereunder.

Section 7.2 Notices. Except as provided below, all communications and notices
provided for hereunder shall be in writing (including bank wire, telecopy or electronic
facsimile transmission or similar writing) and shall be given to the other parties hereto.

Section 7.3 Protection of Ownership Interests of Buyer.

(a) Originator agrees that from time to time, at its expense, it will promptly execute and
deliver all instruments and documents, and take all actions, that may be necessary, or
that Buyer (or its assigns) may reasonably request, to perfect, protect or more fully
evidence the Purchaser Interests with respect to Receivables, the Collections and the
Related Security, or to enable Buyer (or its assigns) to exercise and enforce their
rights and remedies hereunder. At any time upon the occurrence of a Termination
Event and during the continuation thereof, Buyer (or its assigns) may, at Originator's
sole cost and expense, direct Originator to notify the Obligors of Receivables of the
ownership interests of Buyer under this Agreement and may also direct that payments
of all amounts due or that become due under any or all Receivables be made directly
to Buyer or its designee. Buyer acknowledges and agrees that Originator may elect
not to provide such notice to Obligors until such time as it is so directed by Buyer.

(b) If Originator fails to perform any of its obligations hereunder, Buyer (or its assigns)
may (but shall not be required to) perform, or cause performance of, such obligation,
and Buyer's (or such assigns') reasonable out-of-pocket costs and expenses incurred
in connection therewith shall be payable by Originator as provided in Section 6.2.
Originator irrevocably authorizes Buyer (and its assigns) at any time and from time
to time in the sole discretion of Buyer (or its assigns), and appoints Buyer (and its
assigns) as its attorney(s)-in-fact, to act on behalf of Originator (i) following a failure
on the part of Originator to execute the financing statements referred to below on its
own behalf, to execute on behalf of Originator as debtor and to file financing

11

statements necessary or desirable in Buyer's (or its assigns') sole discretion to perfect and to maintain the perfection of the ownership interest of Buyer in the Receivables and (ii) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Receivables as a financing statement in such offices as Buyer (or its assigns) in their sole discretion deem necessary or desirable to perfect and to maintain the perfection of Buyer's ownership interests in the Receivables. This appointment is coupled with an interest and is irrevocable.

Section 7.4 <u>CHOICE OF LAW</u>. THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS.

Section 7.5 <u>CONSENT TO JURISDICTION</u>. EACH PARTY HEREBY IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE EIGHTEENTH JUDICIAL CIRCUIT, DUPAGE COUNTY, ILLINOIS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT AND (II) AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SAID COUT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF BUYER (OR ITS ASSIGNS) TO BRING PROCEEDINGS AGAINST ORIGINATOR IN THE COURTS OF ANY OTHER JURISDICTION.

Section 7.6 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT EXECUTED BY ORIGINATOR PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER.

Section 7.7 <u>Integration; Binding Effect; Survival of Terms</u>.

(a) This Agreement, the Purchase Agreement and each Collection Account Agreement contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings.

(b) This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including any trustee in bankruptcy). This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms and shall remain in full force and effect until terminated in accordance with its terms; <u>provided</u>, <u>however</u>, that the rights and remedies with respect to (i) any breach of any representation and warranty made by

12

Originator pursuant to Article II, (ii) the indemnification and payment provisions shall be continuing and shall survive any termination of this Agreement.

Section 7.8 Counterparts; Severability; Section References. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement. Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Unless otherwise expressly indicated, all references herein to "Article," "Section," "Schedule" or "Exhibit" shall mean articles and sections of, and schedules and exhibits to, this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date hereof.

Originator:
**Renewable Asset Management Co. LLC**

By: _____

Name:   Carol Delgado

Title:   President and CEO

Buyer:
**RAMCO Holdings, LLC.**

By: _____

Name:   Brent Houck

Title:   Executive Vice President

13

**Exhibit I**

Definitions

This is Exhibit I to the Agreement (as hereinafter defined). As used in the Agreement and the Exhibits, Schedules and Annexes thereto, capitalized terms have the meanings set forth in this Exhibit I (such meanings to be equally applicable to the singular and plural forms thereof). If a capitalized term is used in the Agreement, or any Exhibit, Schedule or Annex thereto, and not otherwise defined therein or in this Exhibit I, such term shall have the meaning assigned thereto in Exhibit I to the Purchase Agreement.

"Agent" has the meaning set forth in the Preliminary Statements to the Agreement.

"Agreement" means the Receivables Sale Agreement, dated as of September 2, 2016, between Originator and Buyer, as the same may be amended, restated or otherwise modified.

"Authorized Officer" means, with respect to Originator, its corporate president, secretary, controller, treasurer or chief financial officer or any vice president.

"Business Day" means any day on which banks are not authorized or required to close in Chicago, Illinois and The Depository Trust Company of New York is open for business.

"Buyer" has the meaning set forth in the preamble to the Agreement.

"Calculation Period" means each "Reporting Period" (as defined in the Purchase Agreement) or portion thereof which elapses during the term of the Agreement. The first Calculation Period shall commence on the date of the Purchase of Receivables hereunder and the final Calculation Period shall terminate on the Termination Date.

"Conduit" has the meaning set forth in the Preliminary Statements to the Agreement.

"Discount Factor" means at any time a percentage calculated to provide Buyer with a reasonable return on its investment in the Receivables after taking account of (i) the time value of money based upon the anticipated dates of collection of the Receivables and the cost to Buyer of financing its investment in the Receivables during such period and (ii) the risk of nonpayment by the Obligors. Originator and Buyer may agree from time to time to change the Discount Factor based on changes in one or more of the items affecting the calculation thereof, provided that any change to the Discount Factor shall take effect as of the commencement of a Calculation Period, shall apply only prospectively and shall not affect the Purchase Price payment in respect of the transfer of Receivables hereunder which occurred during any Calculation Period ending prior to the Calculation Period during which Originator and Buyer agree to make such change.

"Material Adverse Effect" means a material adverse effect on (i) the financial condition or operations of Originator, (ii) the ability of Originator to perform its

14

obligations under the Agreement or any other Transaction Document, (iii) the legality, validity or enforceability of the Agreement or any other Transaction Document, (iv) Originator's, Buyer's, the Agent's or any Purchaser's interest in the Receivables generally or in any significant portion of the Receivables, the Related Security or Collections with respect thereto, or (v) the collectability of the Receivables generally or of any material portion of the Receivables.

"Originator" has the meaning set forth in the preamble to the Agreement.

"Permitted Liens" means undetermined, inchoate or statutory deemed trust and/or liens imposed or potentially imposed by application of Law for source deductions, employee claims, taxes or other governmental assessments, charges or levies (i) of which notice has not yet been given or which have not at the relevant time been filed or registered in accordance with applicable Law, or (ii) that are not yet past due or that are being contested in good faith by appropriate proceedings.

"Potential Termination Event" means an event which, with the passage of time or the giving of notice, or both, would constitute a Termination Event.

"Purchase" means the purchase under the Agreement by Buyer from Originator of the Receivables, the Related Security and the Collections related thereto, together with all related rights in connection therewith.

"Purchase Agreement" has the meaning set forth in the Preliminary Statements to the Agreement.

"Purchase Price" means, with respect to the Purchase, the aggregate price to be paid by Buyer to Originator for such Purchase in accordance with Section 1.2 of the Agreement for the Receivables, Collections and Related Security being sold to Buyer on such date, which price shall equal, with respect to any Receivables, (i) the product of (x) the aggregate Original Balance of such Receivables, multiplied by (y) one minus the Discount Factor then in effect, minus (ii) any Purchase Price Credits remaining to be credited against the Purchase Price otherwise payable in accordance with Section 1.3 of the Agreement.

"Receivable" means all indebtedness and other obligations owed by an Obligor to Originator which does not arise as a result of the provision of services to the Obligor, whether constituting an account, contract right, payment intangible, promissory note, chattel paper, claim, instrument document, investment property, financial asset or general intangible, arising in connection with the sale of goods by Originator and further includes, without limitation, the obligation to pay any Finance Charges with respect thereto. Indebtedness and other rights and obligations arising from any one transaction, including, without limitation, indebtedness and other rights and obligations represented by an individual invoice, shall constitute a Receivable separate from a Receivable consisting of the indebtedness and other rights and obligations arising from any other transaction; provided further, that any indebtedness, rights or obligations referred to in the immediately preceding sentence shall be a Receivable regardless of whether the Obligor or Originator treats such indebtedness, rights or obligations as a separate payment obligation.

15

"Termination Event" has the meaning set forth in Section 4.1 of the Agreement.

"Transaction Documents" means, collectively, the Purchase Agreement, this Agreement, each Collection Account Agreement and all other instruments, documents and agreements executed and delivered in connection herewith.

All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles.

**AMENDMENT NO. 1**
**To Receivables Purchase Agreement Dated 9-2-16**

By and between Renewable Asset Management Company ("Originator') and
Ramco Holdings, LLC ("Buyer"):

1. ~~Section 1.1(b)(ii) is deleted as Buyer does assume obligations of~~
   Originator regarding Receivables as between Obligors and Originator.

2. Section 1.2(b) and (c) is deleted as there are no Receivables coming into
   existence for Originator as Buyer assumes and is assigned all obligations
   between Obligors and Originator.

3. Section 1.4 is deleted.

4. Section 1.6 is deleted.

5. Section 3.2 is deleted.

6. Section 4.1(d), (e), (f) and (g) are deleted.

7. Section 4.2 is deleted except to the extent that Buyer and Originator are
   entitled to all rights and remedies available at law and equity.

All remaining terms and conditions remain in full force and effect and the
effective date of this Amendment No. 1 is as of 9-2-16.

Originator:
Renewable Asset Management Company

By: _____
Carol Delgado
Title: President and CEO

Buyer:
Ramco Holdings, LLC

By: _____
Brent Houck
Title: Executive Vice President

## RECEIVABLES PURCHASE AGREEMENT

THIS RECEIVABLES PURCHASE AGREEMENT, dated as of the 2nd day of September, 2016 is by and between Financial Management Services, Inc., FMSI Consumer Credit Corporation, (jointly known as "Originator"), and RAMCO Holdings, LLC ("Buyer"). Unless defined elsewhere herein, capitalized terms used in this Agreement shall have the meanings assigned to such terms in Exhibit I.

## PRELIMINARY STATEMENT

Originator now owns, and from time to time hereafter will own, Receivables. Originator and Buyer are both finance companies whereby in the course of ordinary business, receivables are procured, monitored, serviced and or sold. Receivables are the inventory by which said finance companies do business. Said Receivables are currently encumbered by an unconditional first priority security interest by The Private Bank and Trust (the Lien). Originator wishes to sell and assign to Buyer, and Buyer wishes to purchase from Originator, all of Originator's right, title and interest in and to such Receivables, together with the Related Security and Collections with respect thereto.

## ARTICLE I
## AMOUNTS AND TERMS

Section 1.1 Purchase of Receivables.

(a) Effective on the date hereof, in consideration for the Purchase Price and upon the terms and subject to the conditions set forth herein, Originator does hereby sell, assign, transfer, set-over and otherwise convey to Buyer on a non-serviced basis, without recourse (except to the extent expressly provided herein) and without regard to collectability, and Buyer does hereby purchase from Originator, all of Originator's right, title and interest in and to all Receivables which are existing as of the close of business on the Business Day immediately prior to the date hereof and; provided, that, Buyer shall be obligated to pay the Purchase Price therefor in accordance with Section 1.2. In connection with the payment of the Purchase Price for any Receivables purchased hereunder, Buyer may request that Originator deliver, and Originator shall deliver, such approvals, opinions, information, reports or documents as Buyer may reasonably request.

(b) It is the express intent of the parties hereto that the Purchase of the Receivables made hereunder shall constitute an absolute sale of the Receivables sold under this Agreement by Originator to Buyer and the beneficial interest in and title to the Receivables and the Related Security shall not be part of Originator's estate in the event of any bankruptcy or insolvency proceeding by or against Originator under any bankruptcy or insolvency law. Except for the Purchase Price Credits owed pursuant to Section 1.3, the sale of Receivables hereunder is made without recourse to Originator; provided, however, that (i) Originator shall be liable to Buyer for all representations, warranties and covenants made by Originator pursuant to the terms of

1

the Transaction Documents to which Originator is a party, and (ii) such sale does not constitute and is not intended to result in an assumption by Buyer or any assignee thereof of any obligation of Originator or any other Person arising in connection with the Receivables and/or the Related Security or any other obligations of Originator.

Section 1.2 <u>Payment for the Purchase</u>.

(a) The Purchase Price for the Purchase of Receivables which are in existence on the close of business on the Business Day immediate preceding the date hereof (the "Initial Cutoff Date") shall be $8,075,000.00 and be payable in full by Buyer to Originator on December 30, 2016, (Balloon Payment), and shall be paid at closing with first satisfaction of The Private Bank and Trust's first priority lien, with the remainder to Originator or to whom Originator assigns.

(b) The Purchase Price for each Receivable coming into existence after the Initial Cutoff Date shall be due and owing in full by Buyer to Originator or its designee on the date each such Receivable came into existence and shall be paid to Originator in the manner provided in the following paragraph (c).

(c) Although the Purchase Price for each Receivable coming into existence after the date hereof shall be due and payable in full by Buyer to Originator on the date such Receivable came into existence, and although Buyer intends in the ordinary course to remit to Originator on a daily basis amounts (to the extent available therefor under the Purchase Agreement) from collections on the Receivables for application to the Purchase Price obligation then outstanding, settlement of the Purchase Price between Buyer and Originator shall be effected on a monthly basis on each Settlement Date with respect to all Receivables coming into existence during the same Calculation Period as reported by Originator to Buyer, and Buyer shall pay to Originator in immediately available funds the aggregate Purchase Price owing with respect to such Receivables which remains outstanding on such Settlement Date.

Section 1.3 <u>Transfer of Records</u>.

(a) In connection with the Purchase of Receivables hereunder, Originator hereby sells, transfers, assigns and otherwise conveys to Buyer all of Originator's right and title to and interest in the Records relating to all Receivables sold hereunder, without the need for any further documentation in connection with the Purchase. In connection with such transfer, Originator hereby grants to the Buyer (and authorizes the Buyer to grant to the Agent) and the Servicer an irrevocable, non-exclusive license to use, without royalty or payment of any kind, all software used by Originator to account for the Receivables, to the extent necessary to administer the Receivables, whether such software is owned by Originator or is owned by others and used by Originator under license agreements with respect thereto, <u>provided</u> that should the consent of any licensor of Originator to such grant of the license described herein be required, Originator hereby agrees that upon the request of Buyer (or the Agent as Buyer's assignee), such consent shall be a condition to the grant of the foregoing license with

2

respect to the applicable software and Originator will use its reasonable efforts to obtain the consent of such third-party licensor. The license granted hereby shall be irrevocable, and shall terminate on the date this Agreement terminates in accordance with its terms.

(b) Originator (i) shall take such action requested by Buyer and/or the Agent (as Buyer's assignee), from time to time hereafter, that may be necessary or appropriate to ensure that Buyer and its assigns under the Purchase Agreement have an enforceable ownership interest in the Records relating to the Receivables purchased from Originator hereunder, and (ii) shall use its reasonable efforts to ensure that Buyer, the Agent and the Servicer each has an enforceable right (whether by license or sublicense or otherwise) to use all of the computer software used to account for the Receivables and/or to recreate such Records

Section 1.4 <u>Reconveyance of Receivables on Termination Date</u>.

On the Termination Date, Buyer hereby reassigns to Originator for $1.00, free and clear of any Adverse Claim on the part of Buyer or any assignee of Buyer, all of Buyer's right, title and interest in and to the Receivables, Related Security, any Collections, any Records, Contracts and other rights and documents relating thereto that are originated on or after the Termination Date, which for greater certainty shall be deemed to be Reconveyed Assets, and Buyer and Originator shall promptly execute and deliver all instruments and documents and take all actions necessary, including without limitation any recording, filing or registration, to evidence and give effect to such reassignment. Buyer grants to Originator a power of attorney, coupled with an interest, to act as its attorney for the purpose of doing anything which Buyer may lawfully do by attorney solely for the purpose of effecting any reassignment of Receivables, Related Security, any Collections, any Records, Contracts and other rights and documents relating thereto to be effected in accordance with this Section 1.6.

Section 1.5 <u>Re-characterization</u>.

If the sale of Receivables hereunder is re-characterized as a secured loan and not a sale or if such sale shall for any reason be ineffective or unenforceable, each of the Originator and the Buyer represents and warrants as to itself that each remittance of Collections by the Originator to the Buyer hereunder will have been (i) in payment of a debt incurred by the Originator in the ordinary course of business or financial affairs of the Originator and the Buyer and (ii) made in the ordinary course of business or financial affairs of the Originator and the Buyer.

Section 1.6 <u>Reconveyed Assets</u>.

Notwithstanding anything contained in this Agreement, following the reconveyance of any Reconveyed Assets, the relevant Reconveyed Assets shall be deemed not to form part of the Receivables, Related Security, Collections, Records, Contracts or other rights and documents relating to such Reconveyed Assets sold, transferred assigned to the Buyer or in respect of which other rights were assigned to the Buyer under this Agreement.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Section 2.1 <u>Representations and Warranties of Originator</u>. Originator hereby represents and warrants to Buyer that:

(a) <u>Corporate Existence and Power</u>. Originator is (1) a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and (2) is duly qualified to do business and is in good standing as a foreign corporation (other than in its jurisdiction of incorporation) and has and holds all corporate power and all governmental licenses, authorizations, consents and approvals required to carry on its business in each jurisdiction in which its business is conducted, except in the case of (2) to the extent that any failure to do so could not be reasonably expected to have a Material Adverse Effect.

(b) <u>Power and Authority; Due Authorization Execution and Delivery</u>. The execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party, and the performance of its obligations hereunder and thereunder, and Originator's use of the proceeds of the Purchase made hereunder, are within its corporate powers and authority and have been duly authorized by all necessary corporate action on its part. This Agreement and each other Transaction Document to which Originator is a party has been duly executed and delivered by Originator.

(c) <u>No Conflict</u>. The execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party, and the performance of its obligations hereunder and thereunder do not contravene or violate (i) its certificate or articles of incorporation or by-laws (or equivalent organizational documents), (ii) any law, rule or regulation applicable to it, (iii) any restrictions under any agreement, contract or instrument to which it is a party or by which it or any of its property is bound, or (iv) any order, writ, judgment, award, injunction or decree binding on or affecting it or its property, and do not result in the creation or imposition of any Adverse Claim on assets of Originator (except as created by the Transaction Documents); and no transaction contemplated hereby requires compliance with any bulk sales act or similar law.

(d) <u>Governmental Authorization</u>. Other than the filing of the financing statements required hereunder, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party and the performance of its obligations hereunder and thereunder.

4

(e) <u>Actions, Suits</u>. Both Originator and Buyer are well informed of pending litigation between Originator and The Private Bank and Trust, and the terms of this agreement, and upon payment pursuant to 1.2(a), The Private Bank and Trust shall be paid in full and it is anticipated a Release will be tendered by said bank.

(f) <u>Binding Effect</u>. This Agreement and each other Transaction Document to which Originator is a party constitute the legal, valid and binding obligations of Originator enforceable against Originator in accordance with their respective terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(g) <u>Accuracy of Information</u>. All information heretofore furnished by Originator or any of its Affiliates to Buyer (or its assigns) for purposes of or in connection with this Agreement, any of the other Transaction Documents or any transaction contemplated hereby or thereby is, and all such information hereafter furnished by Originator or any of its Affiliates to Buyer (or its assigns) will be, true and accurate in every material respect on the date such information is stated or certified and does not and will not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not misleading.

(h) <u>Use of Proceeds</u>. No proceeds of the Purchase hereunder will be used for a purpose that violates, or would be inconsistent with any existing laws.

(i) <u>Good Title</u>. Immediately prior to the transfer hereunder of any Receivable, Originator shall be the legal and beneficial owner of each such Receivables and Related Security with respect thereto, free and clear of any Adverse Claim, except as created by the Transaction Documents and the acknowledged first priority security interest of the Lien. There have been duly filed all financing statements or other similar instruments or documents, if any, necessary to perfect Originator's ownership interest in each Receivable, its Collections and the Related Security.

(j) <u>Payments to Originator</u>. With respect to each Receivable transferred to Buyer hereunder, the Purchase Price to be paid to Originator by Buyer constitutes approximately the fair market value in consideration therefor and the terms of this Agreement are consistent with the terms that would be obtained in an arm's length sale, and such transfer was not made for or on account of an antecedent debt.

(k) <u>Enforceability of Contracts</u>. Each Contract with respect to each Receivable is effective to create, and has created, a legal, valid and binding obligation of the related Obligor to pay the Outstanding Balance of the Receivable created thereunder and any accrued interest thereon, enforceable against the Obligor in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a

proceeding in equity or at law).

~~(l) Eligible Receivables. Each Receivable included in the Net Receivables Balance as an Eligible Receivable on the date it came into existence was an Eligible Receivable on such date.~~

(m) <u>Accounting</u>. The manner in which Originator will account for the transactions contemplated by this Agreement is not inconsistent with the characterization or treatment of each transfer hereunder as having the effect of a true sale.

# ARTICLE III
## CONDITIONS OF PURCHASE

Section 3.1 <u>Conditions Precedent to Purchase</u>. The Purchase under this Agreement is subject to the conditions precedent that all of the conditions to the initial purchase under the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

Section 3.2 <u>Conditions Precedent to Subsequent Transfers and Payments</u>. Originator's obligation to transfer and Buyer's obligation to pay for Receivables coming into existence after the date hereof shall be subject to the further conditions precedent that (a) the Termination Date shall not have occurred; and (b) Buyer (or its assigns) shall have received such other approvals, opinions or documents as it may reasonably request.

# ARTICLE IV
## TERMINATION EVENTS

Section 4.1 <u>Termination Events</u>. The occurrence of any one or more of the following events shall constitute a Termination Event:

(a) Originator or Buyer shall fail (i) to make any payment or deposit required hereunder when due, or (ii) to perform or observe any term, covenant or agreement hereunder (other than as referred to in clause (i) of this paragraph (a)) or any other Transaction Document to which it is a party, and such failure shall continue for five (5) consecutive Business Days.

(b) Any representation, warranty, certification or statement made by Originator in this Agreement, any other Transaction Document or in any other document delivered pursuant hereto or thereto shall prove to have been incorrect in any material way when made or deemed made. Notwithstanding the foregoing, a breach of any representation or warranty which relates solely to the eligibility or characteristics of any Receivable shall not constitute a Termination Event hereunder if a Purchase Price Credit Adjustment (and any related payment by Originator) is duly and timely made in accordance with <u>Section 1.3</u> hereof.

(c) Failure of Buyer or any of its Subsidiaries or Affiliates to pay the purchase price as indicated, or the default by Originator or any of its Subsidiaries or Affiliates in the performance of any term, provision or condition contained in any agreement under which any such Indebtedness was created or is governed, the effect of which is to cause, or to permit the holder or holders of such Indebtedness to cause, such Indebtedness to become due prior to its stated maturity; or any such Indebtedness of Originator or any of its Subsidiaries or Affiliates shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled payment) prior to the date of maturity thereof.

(d) (i) Originator or any of its Subsidiaries or Affiliates shall generally not pay its debts as such debts become due or shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Originator or any of its Subsidiaries or Affiliates seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or any substantial part of its property, provided, that in the case of an involuntary proceeding instituted against Originator or any of its Subsidiaries or Affiliates, the Termination Date shall not occur or be declared for 60 days after such proceeding is instituted unless Originator shall at any time during such period consent to or acquiesce in the continuance or maintenance of such proceeding or (ii) Originator or any of its Affiliates shall take any corporate action to authorize any of the actions set forth in the foregoing clause (i) of this subsection (d).

(e) A Change of Control shall occur.

(f) Any cause of action is initiated against the Buyer, and or one or more final judgments for the payment of money shall be entered against Originator.

(g) Termination of the Purchase Agreement in accordance with its terms.

Section 4.2 Remedies.

Upon the occurrence and during the continuation of a Termination Event, Buyer may take any of the following actions: (i) declare (by notice to Originator) the Termination Date to have occurred, whereupon the Termination Date shall forthwith occur, without demand, protest or further notice of any kind, all of which are hereby expressly waived by Originator; provided, however, that upon the occurrence of Termination Event described in Section 4.1(d) (subject to the proviso therein), or of an actual or deemed entry of an order for relief with respect to Originator under any applicable law relating to bankruptcy, insolvency or reorganization or relief of debtors, the Termination Date shall automatically occur, without demand, protest or any notice of any kind, all of which are hereby expressly waived by Originator and (ii) to the fullest extent permitted by applicable law, declare that the Default Fee shall accrue with respect

to any amounts then due and owing by Buyer to Originator. The aforementioned rights and remedies shall be in addition to all other rights and remedies of Buyer and its assigns available under this Agreement, by operation of law, at equity or otherwise, all of which are hereby expressly preserved, including, without limitation, all rights and remedies provided, all of which rights shall be cumulative.

## ARTICLE V
## INDEMNIFICATION

Section 5.1 <u>Indemnities by Originator</u>.

Without limiting any other rights that Buyer may have hereunder or under applicable law, Originator hereby agrees to indemnify Buyer and its assigns (including, without limitation, the Purchasers and the Agent), officers, directors, agents and employees (each an "<u>Indemnified Party</u>") from and against any and all damages, losses, claims, taxes and liabilities, reasonable costs and expenses and for all other amounts payable, including reasonable attorneys' fees (which attorneys may be employees of Buyer) and disbursements (all of the foregoing being collectively referred to as "<u>Indemnified Amounts</u>") awarded against or incurred by any of them arising out of or as a result of this Agreement or the acquisition, either directly or indirectly, by Buyer of an interest in the Receivables pursuant to this Agreement. Accordingly, without limiting the generality of the foregoing indemnification, Originator shall indemnify Buyer for Indemnified Amounts relating to or resulting from:

(i) any representation or warranty made by Originator (or any officers of Originator) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered by Originator pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

(ii) the failure by Originator, to comply with any applicable law, rule or regulation with respect to any Receivable or Contract related thereto, or the nonconformity of any Receivable or Contract included therein with any such applicable law, rule or regulation or any failure of Originator to keep or perform any of its obligations, express or implied, with respect to any Contract;

(iii) any failure of Originator to perform its duties, covenants or other obligations in accordance with the provisions of this Agreement or any other Transaction Document;

(iv) any products liability or similar claim arising out of or in connection with merchandise, insurance or services that are the subject of any Contract;

(v) any dispute, claim, offset or defense (other than discharge in bankruptcy of the Obligor) of the Obligor to the payment of any Receivable (including, without limitation, a defense based on such Receivable or the related Contract not being a legal, valid and binding obligation of such Obligor enforceable against it in accordance with its terms), or any other claim resulting from the sale of the merchandise or service related to such

Receivable or the furnishing or failure to furnish such merchandise or services, in any such case either (i) as a result of any event, fact or circumstance that arose or existed at a time before such Receivable was purchased by Buyer, or (ii) at any time after such purchase, resulting from any action taken by Originator, or any failure to act by Originator where required, with respect to such Receivable;

(vi) the commingling of Collections of Receivables at any time with other funds;

(vii) any investigation, litigation or proceeding related to (i) this Agreement or any of the other Transaction Documents as a result of Originator's participation therein, (ii) the use of proceeds of sales by Originator, (iii) the ownership of the Receivables by Originator prior to their sale to Buyer or, (iv) the ownership of the Receivables by Buyer after the purchase thereof by Buyer and resulting from any action by Originator, or any failure to act by Originator where required;

(viii) any inability to litigate any claim against any Obligor in respect of any Receivable as a result of such Obligor being immune from civil and commercial law and suit on the grounds of sovereignty or otherwise from any legal action, suit or proceeding, in each case as a result of circumstances that existed on or prior to the date of purchase of such Receivable by Buyer;

(ix) any Termination Event as described herein;

(x) the failure to vest in Buyer at the time of Balloon payment to Buyer a first priority, perfected ownership interest in the Receivables, the Related Security and the Collections, free and clear of any Adverse Claim (except as created by the Transaction Documents and except in respect of Permitted Liens);

(xi) any action or omission by Originator which reduces or impairs the rights of Buyer with respect to any Receivable or the value of any such Receivable (unless taken in accordance with the Transaction Documents);

(xii) any attempt by any Person to void the Purchase hereunder under statutory provisions or common law or equitable action; and

(xiii) the failure to pay when due any taxes which are Originator's responsibility to pay, including without limitation, sales, excise or personal property taxes payable in connection with the Receivables.

Notwithstanding anything contained herein to the contrary, Originator shall have no obligation to indemnify any Indemnified Party from and against:

(i) Indemnified Amounts to the extent a final judgment of a court of competent jurisdiction holds that such Indemnified Amounts resulted from gross negligence or willful misconduct on the part of the Indemnified Party seeking indemnification;

(ii) Indemnified Amounts to the extent the same include losses in respect of Receivables that are uncollectible on account of the insolvency, bankruptcy, lack of creditworthiness or failure to pay of or by the related Obligor; or

(iii) taxes imposed by the jurisdiction in which such Indemnified Party's principal executive office is located, on or measured by the overall net income of such Indemnified Party to the extent that the computation of such taxes is consistent with the U.S. Tax Characterization.

Section 5.2 <u>Other Costs and Expenses</u>. Originator shall pay to Buyer on demand all costs and out-of-pocket expenses in connection with the preparation, execution, delivery and administration of this Agreement, the transactions contemplated hereby and the other documents to be delivered hereunder. Originator shall pay to Buyer on demand any and all costs and expenses of Buyer, if any, including reasonable counsel fees and expenses in connection with the enforcement of this Agreement and the other documents delivered hereunder and in connection with any restructuring or workout of this Agreement or such documents, or the administration of this Agreement following a Termination Event.

## ARTICLE VI
## ADMINISTRATION AND COLLECTION

Section 6.1 <u>Collection Accounts</u>. Originator hereby transfers to Buyer the exclusive ownership and control of each Lock-Box and Collection Account owned by it, provided that, where consented to by Buyer. Originator hereby authorizes Buyer, and agrees that Buyer shall be entitled to (i) endorse Originator's name on checks and other instruments representing Collections, (ii) enforce the Receivables and the Related Security (including the related Contracts insofar as the collection of Receivables is concerned) and (iii) take such action as shall be necessary or desirable to cause all cash, checks and other instruments constituting Collections of Receivables to come into the possession of Buyer.

Section 6.2 <u>Responsibilities of Originator</u>. Anything herein to the contrary notwithstanding, the exercise by Buyer (or its assignees) of its rights hereunder shall not release Originator from any of its duties or obligations with respect to any Receivables or under the related Contracts or Invoices, including the payment when due of any taxes payable in connection with its performance under the Contracts relating to the Receivables. Buyer shall have no obligation or liability with respect to any Receivables or related Contracts or Invoices, nor shall Buyer be obligated to perform the obligations of Originator.

ARTICLE VII
MISCELLANEOUS

Section 7.1 Waivers and Amendments.

(a) No failure or delay on the part of Buyer (or its assigns) in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy. The rights and remedies herein provided shall be cumulative and nonexclusive of any rights or remedies provided by law. Any waiver of this Agreement shall be effective only in the specific instance and for the specific purpose for which given.

(b) No provision of this Agreement may be amended, supplemented, modified or waived except in writing signed by Originator and Buyer.

(c) Buyer shall provide prior written notice to Originator of any amendments or waivers to the Purchase Agreement that may affect any rights and obligations of Originator hereunder.

Section 7.2 Notices. Except as provided below, all communications and notices provided for hereunder shall be in writing (including bank wire, telecopy or electronic facsimile transmission or similar writing) and shall be given to the other parties hereto.

Section 7.3 Protection of Ownership Interests of Buyer.

(a) Originator agrees that from time to time, at its expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may be necessary, or that Buyer (or its assigns) may reasonably request, to perfect, protect or more fully evidence the Purchaser Interests with respect to Receivables, the Collections and the Related Security, or to enable Buyer (or its assigns) to exercise and enforce their rights and remedies hereunder. At any time upon the occurrence of a Termination Event and during the continuation thereof, Buyer (or its assigns) may, at Originator's sole cost and expense, direct Originator to notify the Obligors of Receivables of the ownership interests of Buyer under this Agreement and may also direct that payments of all amounts due or that become due under any or all Receivables be made directly to Buyer or its designee. Buyer acknowledges and agrees that Originator may elect not to provide such notice to Obligors until such time as it is so directed by Buyer.

(b) If Originator fails to perform any of its obligations hereunder, Buyer (or its assigns) may (but shall not be required to) perform, or cause performance of, such obligation, and Buyer's (or such assigns') reasonable out-of-pocket costs and expenses incurred in connection therewith shall be payable by Originator as provided in Section 6.2. Originator irrevocably authorizes Buyer (and its assigns) at any time and from time to time in the sole discretion of Buyer (or its assigns), and appoints Buyer (and its assigns) as its attorney(s)-in-fact, to act on behalf of Originator (i) following a failure on the part of Originator to execute the financing statements referred to below on its own behalf, to execute on behalf of Originator as debtor and to file financing

11

statements necessary or desirable in Buyer's (or its assigns') sole discretion to perfect and to maintain the perfection of the ownership interest of Buyer in the Receivables and (ii) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Receivables as a financing statement in such offices as Buyer (or its assigns) in their sole discretion deem necessary or desirable to perfect and to maintain the perfection of Buyer's ownership interests in the Receivables. This appointment is coupled with an interest and is irrevocable.

Section 7.4 CHOICE OF LAW. THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS.

Section 7.5 CONSENT TO JURISDICTION. EACH PARTY HEREBY IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE EIGHTEENTH JUDICIAL CIRCUIT, DUPAGE COUNTY, ILLINOIS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT AND (II) AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SAID COUT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF BUYER (OR ITS ASSIGNS) TO BRING PROCEEDINGS AGAINST ORIGINATOR IN THE COURTS OF ANY OTHER JURISDICTION.

Section 7.6 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT EXECUTED BY ORIGINATOR PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER.

Section 7.7 Integration; Binding Effect; Survival of Terms.

(a) This Agreement, the Purchase Agreement and each Collection Account Agreement contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings.

(b) This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including any trustee in bankruptcy). This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms and shall remain in full force and effect until terminated in accordance with its terms; provided, however, that the rights and remedies with respect to (i) any breach of any representation and warranty made by

Originator pursuant to Article II, (ii) the indemnification and payment provisions shall be continuing and shall survive any termination of this Agreement.

Section 7.8 Counterparts; Severability; Section References. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement. Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Unless otherwise expressly indicated, all references herein to "Article," "Section," "Schedule" or "Exhibit" shall mean articles and sections of, and schedules and exhibits to, this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date hereof.

Originator:
**Financial Management Services, Inc.**
**FMSI Consumer Credit Corp.**

By: _____
Name: Carol Delgado
Title:   President and CEO


Buyer:
**RAMCO Holdings, LLC.**

By: _____
Name: Brent Houck
Title:   Executive Vice President

## **Exhibit I**

### Definitions

This is Exhibit I to the Agreement (as hereinafter defined). As used in the Agreement and the Exhibits, Schedules and Annexes thereto, capitalized terms have the meanings set forth in this Exhibit I (such meanings to be equally applicable to the singular and plural forms thereof). If a capitalized term is used in the Agreement, or any Exhibit, Schedule or Annex thereto, and not otherwise defined therein or in this Exhibit I, such term shall have the meaning assigned thereto in Exhibit I to the Purchase Agreement.

"Agent" has the meaning set forth in the Preliminary Statements to the Agreement.

"Agreement" means the Receivables Sale Agreement, dated as of September 2, 2016, between Originator and Buyer, as the same may be amended, restated or otherwise modified.

"Authorized Officer" means, with respect to Originator, its corporate president, secretary, controller, treasurer or chief financial officer or any vice president.

"Business Day" means any day on which banks are not authorized or required to close in Chicago, Illinois and The Depository Trust Company of New York is open for business.

"Buyer" has the meaning set forth in the preamble to the Agreement.

"Calculation Period" means each "Reporting Period" (as defined in the Purchase Agreement) or portion thereof which elapses during the term of the Agreement. The first Calculation Period shall commence on the date of the Purchase of Receivables hereunder and the final Calculation Period shall terminate on the Termination Date.

"Conduit" has the meaning set forth in the Preliminary Statements to the Agreement.

"Discount Factor" means at any time a percentage calculated to provide Buyer with a reasonable return on its investment in the Receivables after taking account of (i) the time value of money based upon the anticipated dates of collection of the Receivables and the cost to Buyer of financing its investment in the Receivables during such period and (ii) the risk of nonpayment by the Obligors. Originator and Buyer may agree from time to time to change the Discount Factor based on changes in one or more of the items affecting the calculation thereof, provided that any change to the Discount Factor shall take effect as of the commencement of a Calculation Period, shall apply only prospectively and shall not affect the Purchase Price payment in respect of the transfer of Receivables hereunder which occurred during any Calculation Period ending prior to the Calculation Period during which Originator and Buyer agree to make such change.

"Material Adverse Effect" means a material adverse effect on (i) the financial condition or operations of Originator, (ii) the ability of Originator to perform its

obligations under the Agreement or any other Transaction Document, (iii) the legality, validity or enforceability of the Agreement or any other Transaction Document, (iv) Originator's, Buyer's, the Agent's or any Purchaser's interest in the Receivables generally or in any significant portion of the Receivables, the Related Security or Collections with respect thereto, or (v) the collectability of the Receivables generally or of any material portion of the Receivables.

"Originator" has the meaning set forth in the preamble to the Agreement.

"Permitted Liens" means undetermined, inchoate or statutory deemed trust and/or liens imposed or potentially imposed by application of Law for source deductions, employee claims, taxes or other governmental assessments, charges or levies (i) of which notice has not yet been given or which have not at the relevant time been filed or registered in accordance with applicable Law, or (ii) that are not yet past due or that are being contested in good faith by appropriate proceedings.

"Potential Termination Event" means an event which, with the passage of time or the giving of notice, or both, would constitute a Termination Event.

"Purchase" means the purchase under the Agreement by Buyer from Originator of the Receivables, the Related Security and the Collections related thereto, together with all related rights in connection therewith.

"Purchase Agreement" has the meaning set forth in the Preliminary Statements to the Agreement.

"Purchase Price" means, with respect to the Purchase, the aggregate price to be paid by Buyer to Originator for such Purchase in accordance with Section 1.2 of the Agreement for the Receivables, Collections and Related Security being sold to Buyer on such date, which price shall equal, with respect to any Receivables, (i) the product of (x) the aggregate Original Balance of such Receivables, multiplied by (y) one minus the Discount Factor then in effect, minus (ii) any Purchase Price Credits remaining to be credited against the Purchase Price otherwise payable in accordance with Section 1.3 of the Agreement.

"Receivable" means all indebtedness and other obligations owed by an Obligor to Originator which does not arise as a result of the provision of services to the Obligor, whether constituting an account, contract right, payment intangible, promissory note, chattel paper, claim, instrument document, investment property, financial asset or general intangible, arising in connection with the sale of goods by Originator and further includes, without limitation, the obligation to pay any Finance Charges with respect thereto. Indebtedness and other rights and obligations arising from any one transaction, including, without limitation, indebtedness and other rights and obligations represented by an individual invoice, shall constitute a Receivable separate from a Receivable consisting of the indebtedness and other rights and obligations arising from any other transaction; provided further, that any indebtedness, rights or obligations referred to in the immediately preceding sentence shall be a Receivable regardless of whether the Obligor or Originator treats such indebtedness, rights or obligations as a separate payment obligation.

15

"Termination Event" has the meaning set forth in Section 4.1 of the Agreement.

"Transaction Documents" means, collectively, the Purchase Agreement, this Agreement, each Collection Account Agreement and all other instruments, documents and agreements executed and delivered in connection herewith.

All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles.

**AMENDMENT NO. 1**
**To Receivables Purchase Agreement Dated 9-2-16**

By and between Financial Management Services, Inc. and its wholly owned
subsidiary FMSI Consumer Credit Corporation ("Originator") and Ramco Holdings, LLC
("Buyer"):

1. Section 1.1(b)(ii) is deleted as Buyer does assume obligations of
   Originator regarding Receivables as between Obligors and Originator.

2. Section 1.2(b) and (e) is deleted as there are no Receivables coming into
   existence for Originator as Buyer assumes and is assigned all obligations
   between Obligors and Originator.

3. Section 1.4 is deleted.

4. Section 1.6 is deleted.

5. Section 3.2 is deleted.

6. Section 4.1(d), (e), (f) and (g) are deleted.

7. Section 4.2 is deleted except to the extent that Buyer and Originator are
   entitled to all rights and remedies available at law and equity.

All remaining terms and conditions remain in full force and effect and the
effective date of this Amendment No. 1 is as of 9-2-16.

Originator:
Financial Management Services, Inc.
and its wholly owned subsidiary
FMSI Consumer Credit Corporation

By: _____
Carol Delgado
Title: President and CEO

Buyer:
Ramco Holdings, LLC

By: _____
Brent Houck
Title: Executive Vice President

# RECEIVABLES PURCHASE AGREEMENT

THIS RECEIVABLES PURCHASE AGREEMENT, dated as of the 2nd day of September, 2016 is by and between Three Marketiers, LLC, ("Originator"), and RAMCO Holdings, LLC ("Buyer"). Unless defined elsewhere herein, capitalized terms used in this Agreement shall have the meanings assigned to such terms in Exhibit I.

## PRELIMINARY STATEMENT

Originator now owns, and from time to time hereafter will own, Receivables. Originator and Buyer are both companies whereby in the course of ordinary business, receivables are procured, monitored, serviced and or sold. Said Receivables are currently encumbered by an unconditional first priority security interest by The Private Bank and Trust (the Lien). Originator wishes to sell and assign to Buyer, and Buyer wishes to purchase from Originator, all of Originator's right, title and interest in and to such Receivables, together with the Related Security and Collections with respect thereto.

## ARTICLE I
## AMOUNTS AND TERMS

Section 1.1 Purchase of Receivables.

(a) Effective on the date hereof, in consideration for the Purchase Price and upon the terms and subject to the conditions set forth herein, Originator does hereby sell, assign, transfer, set-over and otherwise convey to Buyer on a non-serviced basis, without recourse (except to the extent expressly provided herein) and without regard to collectability, and Buyer does hereby purchase from Originator, all of Originator's right, title and interest in and to all Receivables which are existing as of the close of business on the Business Day immediately prior to the date hereof and; provided, that, Buyer shall be obligated to pay the Purchase Price therefor in accordance with Section 1.2. In connection with the payment of the Purchase Price for any Receivables purchased hereunder, Buyer may request that Originator deliver, and Originator shall deliver, such approvals, opinions, information, reports or documents as Buyer may reasonably request.

(b) It is the express intent of the parties hereto that the Purchase of the Receivables made hereunder shall constitute an absolute sale of the Receivables sold under this Agreement by Originator to Buyer and the beneficial interest in and title to the Receivables and the Related Security shall not be part of Originator's estate in the event of any bankruptcy or insolvency proceeding by or against Originator under any bankruptcy or insolvency law. Except for the Purchase Price Credits owed pursuant to Section 1.3, the sale of Receivables hereunder is made without recourse to Originator; provided, however, that (i) Originator shall be liable to Buyer for all representations, warranties and covenants made by Originator pursuant to the terms of the Transaction Documents to which Originator is a party, and (ii) such sale does not constitute and is not intended to result in an assumption by Buyer or any assignee

1

thereof of any obligation of Originator or any other Person arising in connection with the Receivables and/or the Related Security or any other obligations of Originator.

Section 1.2 Payment for the Purchase.

(a) The Purchase Price for the Purchase of Receivables which are in existence on the close of business on the Business Day immediate preceding the date hereof (the "Initial Cutoff Date") shall be $100,000.00 and be payable in full by Buyer to Originator on December 30, 2016, (Balloon Payment), and shall be paid at closing with first satisfaction of The Private Bank and Trust's first priority lien, with the remainder to Originator or to whom Originator assigns.

(b) The Purchase Price for each Receivable coming into existence after the Initial Cutoff Date shall be due and owing in full by Buyer to Originator or its designee on the date each such Receivable came into existence and shall be paid to Originator in the manner provided in the following paragraph (c).

(c) Although the Purchase Price for each Receivable coming into existence after the date hereof shall be due and payable in full by Buyer to Originator on the date such Receivable came into existence, and although Buyer intends in the ordinary course to remit to Originator on a daily basis amounts (to the extent available therefor under the Purchase Agreement) from collections on the Receivables for application to the Purchase Price obligation then outstanding, settlement of the Purchase Price between Buyer and Originator shall be effected on a monthly basis on each Settlement Date with respect to all Receivables coming into existence during the same Calculation Period as reported by Originator to Buyer, and Buyer shall pay to Originator in immediately available funds the aggregate Purchase Price owing with respect to such Receivables which remains outstanding on such Settlement Date.

Section 1.3 Transfer of Records.

(a) In connection with the Purchase of Receivables hereunder, Originator hereby sells, transfers, assigns and otherwise conveys to Buyer all of Originator's right and title to and interest in the Records relating to all Receivables sold hereunder, without the need for any further documentation in connection with the Purchase. In connection with such transfer, Originator hereby grants to the Buyer (and authorizes the Buyer to grant to the Agent) and the Servicer an irrevocable, non-exclusive license to use, without royalty or payment of any kind, all software used by Originator to account for the Receivables, to the extent necessary to administer the Receivables, whether such software is owned by Originator or is owned by others and used by Originator under license agreements with respect thereto, provided that should the consent of any licensor of Originator to such grant of the license described herein be required, Originator hereby agrees that upon the request of Buyer (or the Agent as Buyer's assignee), such consent shall be a condition to the grant of the foregoing license with respect to the applicable software and Originator will use its reasonable efforts to obtain the consent of such third-party licensor. The license granted hereby shall be

irrevocable, and shall terminate on the date this Agreement terminates in accordance with its terms.

(b) Originator (i) shall take such action requested by Buyer and/or the Agent (as Buyer's assignee), from time to time hereafter, that may be necessary or appropriate to ensure that Buyer and its assigns under the Purchase Agreement have an enforceable ownership interest in the Records relating to the Receivables purchased from Originator hereunder, and (ii) shall use its reasonable efforts to ensure that Buyer, the Agent and the Servicer each has an enforceable right (whether by license or sublicense or otherwise) to use all of the computer software used to account for the Receivables and/or to recreate such Records

Section 1.4 Reconveyance of Receivables on Termination Date.

On the Termination Date, Buyer hereby reassigns to Originator for $1.00, free and clear of any Adverse Claim on the part of Buyer or any assignee of Buyer, all of Buyer's right, title and interest in and to the Receivables, Related Security, any Collections, any Records, Contracts and other rights and documents relating thereto that are originated on or after the Termination Date, which for greater certainty shall be deemed to be Reconveyed Assets, and Buyer and Originator shall promptly execute and deliver all instruments and documents and take all actions necessary, including without limitation any recording, filing or registration, to evidence and give effect to such reassignment. Buyer grants to Originator a power of attorney, coupled with an interest, to act as its attorney for the purpose of doing anything which Buyer may lawfully do by attorney solely for the purpose of effecting any reassignment of Receivables, Related Security, any Collections, any Records, Contracts and other rights and documents relating thereto to be effected in accordance with this Section 1.6.

Section 1.5 Re-characterization.

If the sale of Receivables hereunder is re-characterized as a secured loan and not a sale or if such sale shall for any reason be ineffective or unenforceable, each of the Originator and the Buyer represents and warrants as to itself that each remittance of Collections by the Originator to the Buyer hereunder will have been (i) in payment of a debt incurred by the Originator in the ordinary course of business or financial affairs of the Originator and the Buyer and (ii) made in the ordinary course of business or financial affairs of the Originator and the Buyer.

Section 1.6 Reconveyed Assets.

Notwithstanding anything contained in this Agreement, following the reconveyance of any Reconveyed Assets, the relevant Reconveyed Assets shall be deemed not to form part of the Receivables, Related Security, Collections, Records, Contracts or other rights and documents relating to such Reconveyed Assets sold, transferred assigned to the Buyer or in respect of which other rights were assigned to the Buyer under this Agreement.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Section 2.1 <u>Representations and Warranties of Originator</u>. Originator hereby represents and warrants to Buyer that:

(a) <u>Corporate Existence and Power</u>. Originator is (1) a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and (2) is duly qualified to do business and is in good standing as a foreign corporation (other than in its jurisdiction of incorporation) and has and holds all corporate power and all governmental licenses, authorizations, consents and approvals required to carry on its business in each jurisdiction in which its business is conducted, except in the case of (2) to the extent that any failure to do so could not be reasonably expected to have a Material Adverse Effect.

(b) <u>Power and Authority; Due Authorization Execution and Delivery</u>. The execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party, and the performance of its obligations hereunder and thereunder, and Originator's use of the proceeds of the Purchase made hereunder, are within its corporate powers and authority and have been duly authorized by all necessary corporate action on its part. This Agreement and each other Transaction Document to which Originator is a party has been duly executed and delivered by Originator.

(c) <u>No Conflict</u>. The execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party, and the performance of its obligations hereunder and thereunder do not contravene or violate (i) its certificate or articles of incorporation or by-laws (or equivalent organizational documents), (ii) any law, rule or regulation applicable to it, (iii) any restrictions under any agreement, contract or instrument to which it is a party or by which it or any of its property is bound, or (iv) any order, writ, judgment, award, injunction or decree binding on or affecting it or its property, and do not result in the creation or imposition of any Adverse Claim on assets of Originator (except as created by the Transaction Documents); and no transaction contemplated hereby requires compliance with any bulk sales act or similar law.

(d) <u>Governmental Authorization</u>. Other than the filing of the financing statements required hereunder, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution and delivery by Originator of this Agreement and each other Transaction Document to which it is a party and the performance of its obligations hereunder and thereunder.

(e) <u>Actions, Suits</u>. Both Originator and Buyer are well informed of pending litigation between Originator and The Private Bank and Trust, and the terms of this agreement, and upon payment pursuant to 1.2(a), The Private Bank and Trust shall be paid in full

and it is anticipated a Release will be tendered by said bank.

(f) <u>Binding Effect</u>. This Agreement and each other Transaction Document to which Originator is a party constitute the legal, valid and binding obligations of Originator enforceable against Originator in accordance with their respective terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(g) <u>Accuracy of Information</u>. All information heretofore furnished by Originator or any of its Affiliates to Buyer (or its assigns) for purposes of or in connection with this Agreement, any of the other Transaction Documents or any transaction contemplated hereby or thereby is, and all such information hereafter furnished by Originator or any of its Affiliates to Buyer (or its assigns) will be, true and accurate in every material respect on the date such information is stated or certified and does not and will not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not misleading.

(h) <u>Use of Proceeds</u>. No proceeds of the Purchase hereunder will be used for a purpose that violates, or would be inconsistent with any existing laws.

(i) <u>Good Title</u>. Immediately prior to the transfer hereunder of any Receivable, Originator shall be the legal and beneficial owner of each such Receivables and Related Security with respect thereto, free and clear of any Adverse Claim, except as created by the Transaction Documents and the acknowledged first priority security interest of the Lien. There have been duly filed all financing statements or other similar instruments or documents, if any, necessary to perfect Originator's ownership interest in each Receivable, its Collections and the Related Security.

(j) <u>Payments to Originator</u>. With respect to each Receivable transferred to Buyer hereunder, the Purchase Price to be paid to Originator by Buyer constitutes approximately the fair market value in consideration therefor and the terms of this Agreement are consistent with the terms that would be obtained in an arm's length sale, and such transfer was not made for or on account of an antecedent debt.

(k) <u>Enforceability of Contracts</u>. Each Contract with respect to each Receivable is effective to create, and has created, a legal, valid and binding obligation of the related Obligor to pay the Outstanding Balance of the Receivable created thereunder and any accrued interest thereon, enforceable against the Obligor in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(l) <u>Eligible Receivables</u>. Each Receivable included in the Net Receivables Balance as an

Eligible Receivable on the date it came into existence was an Eligible Receivable on such date.

(m) Accounting. The manner in which Originator will account for the transactions contemplated by this Agreement is not inconsistent with the characterization or treatment of each transfer hereunder as having the effect of a true sale.

ARTICLE III
CONDITIONS OF PURCHASE

Section 3.1 <u>Conditions Precedent to Purchase</u>. The Purchase under this Agreement is subject to the conditions precedent that all of the conditions to the initial purchase under the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

Section 3.2 <u>Conditions Precedent to Subsequent Transfers and Payments</u>. Originator's obligation to transfer and Buyer's obligation to pay for Receivables coming into existence after the date hereof shall be subject to the further conditions precedent that (a) the Termination Date shall not have occurred; and (b) Buyer (or its assigns) shall have received such other approvals, opinions or documents as it may reasonably request.

ARTICLE IV
TERMINATION EVENTS

Section 4.1 <u>Termination Events</u>. The occurrence of any one or more of the following events shall constitute a Termination Event:

(a) Originator or Buyer shall fail (i) to make any payment or deposit required hereunder when due, or (ii) to perform or observe any term, covenant or agreement hereunder (other than as referred to in clause (i) of this paragraph (a)) or any other Transaction Document to which it is a party, and such failure shall continue for five (5) consecutive Business Days.

(b) Any representation, warranty, certification or statement made by Originator in this Agreement, any other Transaction Document or in any other document delivered pursuant hereto or thereto shall prove to have been incorrect in any material way when made or deemed made. Notwithstanding the foregoing, a breach of any representation or warranty which relates solely to the eligibility or characteristics of any Receivable shall not constitute a Termination Event hereunder if a Purchase Price Credit Adjustment (and any related payment by Originator) is duly and timely made in accordance with Section 1.3 hereof.

(c) Failure of Buyer or any of its Subsidiaries or Affiliates to pay the purchase price as indicated, or the default by Originator or any of its Subsidiaries or Affiliates in the performance of any term, provision or condition contained in any agreement under

6

which any such Indebtedness was created or is governed, the effect of which is to cause, or to permit the holder or holders of such Indebtedness to cause, such Indebtedness to become due prior to its stated maturity; or any such Indebtedness of Originator or any of its Subsidiaries or Affiliates shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled payment) prior to the date of maturity thereof.

(d) (i) Originator or any of its Subsidiaries or Affiliates shall generally not pay its debts as such debts become due or shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Originator or any of its Subsidiaries or Affiliates seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or any substantial part of its property, provided, that in the case of an involuntary proceeding instituted against Originator or any of its Subsidiaries or Affiliates, the Termination Date shall not occur or be declared for 60 days after such proceeding is instituted unless Originator shall at any time during such period consent to or acquiesce in the continuance or maintenance of such proceeding or (ii) Originator or any of its Affiliates shall take any corporate action to authorize any of the actions set forth in the foregoing clause (i) of this subsection (d).

(e) A Change of Control shall occur.

(f) Any cause of action is initiated against the Buyer, and or one or more final judgments for the payment of money shall be entered against Originator.

(g) Termination of the Purchase Agreement in accordance with its terms.

Section 4.2 Remedies.

Upon the occurrence and during the continuation of a Termination Event, Buyer may take any of the following actions: (i) declare (by notice to Originator) the Termination Date to have occurred, whereupon the Termination Date shall forthwith occur, without demand, protest or further notice of any kind, all of which are hereby expressly waived by Originator; provided, however, that upon the occurrence of Termination Event described in Section 4.1(d) (subject to the proviso therein), or of an actual or deemed entry of an order for relief with respect to Originator under any applicable law relating to bankruptcy, insolvency or reorganization or relief of debtors, the Termination Date shall automatically occur, without demand, protest or any notice of any kind, all of which are hereby expressly waived by Originator and (ii) to the fullest extent permitted by applicable law, declare that the Default Fee shall accrue with respect to any amounts then due and owing by Buyer to Originator. The aforementioned rights and remedies shall be in addition to all other rights and remedies of Buyer and its assigns available under this Agreement, by operation of law, at equity or otherwise, all of which

are hereby expressly preserved, including, without limitation, all rights and remedies provided, all of which rights shall be cumulative.

ARTICLE V

INDEMNIFICATION

Section 5.1 <u>Indemnities by Originator</u>.

Without limiting any other rights that Buyer may have hereunder or under applicable law, Originator hereby agrees to indemnify Buyer and its assigns (including, without limitation, the Purchasers and the Agent), officers, directors, agents and employees (each an "<u>Indemnified Party</u>") from and against any and all damages, losses, claims, taxes and liabilities, reasonable costs and expenses and for all other amounts payable, including reasonable attorneys' fees (which attorneys may be employees of Buyer) and disbursements (all of the foregoing being collectively referred to as "<u>Indemnified Amounts</u>") awarded against or incurred by any of them arising out of or as a result of this Agreement or the acquisition, either directly or indirectly, by Buyer of an interest in the Receivables pursuant to this Agreement. Accordingly, without limiting the generality of the foregoing indemnification, Originator shall indemnify Buyer for Indemnified Amounts relating to or resulting from:

> (i) any representation or warranty made by Originator (or any officers of Originator) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered by Originator pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

> (ii) the failure by Originator, to comply with any applicable law, rule or regulation with respect to any Receivable or Contract related thereto, or the nonconformity of any Receivable or Contract included therein with any such applicable law, rule or regulation or any failure of Originator to keep or perform any of its obligations, express or implied, with respect to any Contract;

> (iii) any failure of Originator to perform its duties, covenants or other obligations in accordance with the provisions of this Agreement or any other Transaction Document;

> (iv) any products liability or similar claim arising out of or in connection with merchandise, insurance or services that are the subject of any Contract;

> (v) any dispute, claim, offset or defense (other than discharge in bankruptcy of the Obligor) of the Obligor to the payment of any Receivable (including, without limitation, a defense based on such Receivable or the related Contract not being a legal, valid and binding obligation of such Obligor enforceable against it in accordance with its terms), or any other claim resulting from the sale of the merchandise or service related to such Receivable or the furnishing or failure to furnish such merchandise or services, in any such case either (i) as a result of any event, fact or circumstance that arose or existed at a time before such Receivable was

8

purchased by Buyer, or (ii) at any time after such purchase, resulting from any action taken by Originator, or any failure to act by Originator where required, with respect to such Receivable;

(vi) the commingling of Collections of Receivables at any time with other funds;

(vii) any investigation, litigation or proceeding related to (i) this Agreement or any of the other Transaction Documents as a result of Originator's participation therein, (ii) the use of proceeds of sales by Originator, (iii) the ownership of the Receivables by Originator prior to their sale to Buyer or, (iv) the ownership of the Receivables by Buyer after the purchase thereof by Buyer and resulting from any action by Originator, or any failure to act by Originator where required;

(viii) any inability to litigate any claim against any Obligor in respect of any Receivable as a result of such Obligor being immune from civil and commercial law and suit on the grounds of sovereignty or otherwise from any legal action, suit or proceeding, in each case as a result of circumstances that existed on or prior to the date of purchase of such Receivable by Buyer;

(ix) any Termination Event as described herein;

(x) the failure to vest in Buyer at the time of Balloon payment to Buyer a first priority, perfected ownership interest in the Receivables, the Related Security and the Collections, free and clear of any Adverse Claim (except as created by the Transaction Documents and except in respect of Permitted Liens);

(xi) any action or omission by Originator which reduces or impairs the rights of Buyer with respect to any Receivable or the value of any such Receivable (unless taken in accordance with the Transaction Documents);

(xii) any attempt by any Person to void the Purchase hereunder under statutory provisions or common law or equitable action; and

(xiii) the failure to pay when due any taxes which are Originator's responsibility to pay, including without limitation, sales, excise or personal property taxes payable in connection with the Receivables.

Notwithstanding anything contained herein to the contrary, Originator shall have no obligation to indemnify any Indemnified Party from and against:

(i) Indemnified Amounts to the extent a final judgment of a court of competent jurisdiction holds that such Indemnified Amounts resulted from gross negligence or willful misconduct on the part of the Indemnified Party seeking indemnification;

(ii) Indemnified Amounts to the extent the same include losses in respect of Receivables that are uncollectible on account of the insolvency, bankruptcy, lack of creditworthiness or failure to pay of or by the related Obligor; or

(iii) taxes imposed by the jurisdiction in which such Indemnified Party's principal executive office is located, on or measured by the overall net

income of such Indemnified Party to the extent that the computation of such taxes is consistent with the U.S. Tax Characterization.

Section 5.2 <u>Other Costs and Expenses</u>. Originator shall pay to Buyer on demand all costs and out-of-pocket expenses in connection with the preparation, execution, delivery and administration of this Agreement, the transactions contemplated hereby and the other documents to be delivered hereunder. Originator shall pay to Buyer on demand any and all costs and expenses of Buyer, if any, including reasonable counsel fees and expenses in connection with the enforcement of this Agreement and the other documents delivered hereunder and in connection with any restructuring or workout of this Agreement or such documents, or the administration of this Agreement following a Termination Event.

## ARTICLE VI
## ADMINISTRATION AND COLLECTION

Section 6.1 <u>Collection Accounts</u>. Originator hereby transfers to Buyer the exclusive ownership and control of each Lock-Box and Collection Account owned by it, provided that, where consented to by Buyer. Originator hereby authorizes Buyer, and agrees that Buyer shall be entitled to (i) endorse Originator's name on checks and other instruments representing Collections, (ii) enforce the Receivables and the Related Security (including the related Contracts insofar as the collection of Receivables is concerned) and (iii) take such action as shall be necessary or desirable to cause all cash, checks and other instruments constituting Collections of Receivables to come into the possession of Buyer.

Section 6.2 <u>Responsibilities of Originator</u>. Anything herein to the contrary notwithstanding, the exercise by Buyer (or its assignees) of its rights hereunder shall not release Originator from any of its duties or obligations with respect to any Receivables or under the related Contracts or Invoices, including the payment when due of any taxes payable in connection with its performance under the Contracts relating to the Receivables. Buyer shall have no obligation or liability with respect to any Receivables or related Contracts or Invoices, nor shall Buyer be obligated to perform the obligations of Originator.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1 <u>Waivers and Amendments</u>.

(a) No failure or delay on the part of Buyer (or its assigns) in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy. The rights and remedies herein provided shall be cumulative and nonexclusive of any rights or remedies provided by law. Any waiver of this Agreement shall be effective only in the specific instance and for the specific purpose for which given.

(b) No provision of this Agreement may be amended, supplemented, modified or waived except in writing signed by Originator and Buyer.

(c) Buyer shall provide prior written notice to Originator of any amendments or waivers to the Purchase Agreement that may affect any rights and obligations of Originator hereunder.

      Section 7.2 <u>Notices</u>. Except as provided below, all communications and notices provided for hereunder shall be in writing (including bank wire, telecopy or electronic facsimile transmission or similar writing) and shall be given to the other parties hereto.

      Section 7.3 <u>Protection of Ownership Interests of Buyer</u>.

(a) Originator agrees that from time to time, at its expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may be necessary, or that Buyer (or its assigns) may reasonably request, to perfect, protect or more fully evidence the Purchaser Interests with respect to Receivables, the Collections and the Related Security, or to enable Buyer (or its assigns) to exercise and enforce their rights and remedies hereunder. At any time upon the occurrence of a Termination Event and during the continuation thereof, Buyer (or its assigns) may, at Originator's sole cost and expense, direct Originator to notify the Obligors of Receivables of the ownership interests of Buyer under this Agreement and may also direct that payments of all amounts due or that become due under any or all Receivables be made directly to Buyer or its designee. Buyer acknowledges and agrees that Originator may elect not to provide such notice to Obligors until such time as it is so directed by Buyer.

(b) If Originator fails to perform any of its obligations hereunder, Buyer (or its assigns) may (but shall not be required to) perform, or cause performance of, such obligation, and Buyer's (or such assigns') reasonable out-of-pocket costs and expenses incurred in connection therewith shall be payable by Originator as provided in <u>Section 6.2</u>. Originator irrevocably authorizes Buyer (and its assigns) at any time and from time to time in the sole discretion of Buyer (or its assigns), and appoints Buyer (and its assigns) as its attorney(s)-in-fact, to act on behalf of Originator (i) to act upon a failure on the part of Originator to execute the financing statements referred to below on its own behalf, to execute on behalf of Originator as debtor and to file financing statements necessary or desirable in Buyer's (or its assigns') sole discretion to perfect and to maintain the perfection of the ownership interest of Buyer in the Receivables and (ii) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Receivables as a financing statement in such

offices as Buyer (or its assigns) in their sole discretion deem necessary or desirable to perfect and to maintain the perfection of Buyer's ownership interests in the Receivables. This appointment is coupled with an interest and is irrevocable.

Section 7.4 CHOICE OF LAW. THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS.

Section 7.5 CONSENT TO JURISDICTION. EACH PARTY HEREBY IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE EIGHTEENTH JUDICIAL CIRCUIT, DUPAGE COUNTY, ILLINOIS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT AND (II) AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SAID COUT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. NOTHING HEREIN SHALL LIMIT THE RIGHT OF BUYER (OR ITS ASSIGNS) TO BRING PROCEEDINGS AGAINST ORIGINATOR IN THE COURTS OF ANY OTHER JURISDICTION.

Section 7.6 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT EXECUTED BY ORIGINATOR PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER.

Section 7.7 Integration; Binding Effect; Survival of Terms.

(a) This Agreement, the Purchase Agreement and each Collection Account Agreement contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings.

(b) This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including any trustee in bankruptcy). This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms and shall remain in full force and effect until terminated in accordance with its terms; provided, however, that the rights and remedies with respect to (i) any breach of any representation and warranty made by Originator pursuant to Article II, (ii) the indemnification and payment provisions shall be continuing and shall survive any termination of this Agreement.

Section 7.8 <u>Counterparts: Severability; Section References</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement. Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Unless otherwise expressly indicated, all references herein to "Article," "Section," "Schedule" or "Exhibit" shall mean articles and sections of, and schedules and exhibits to, this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date hereof.

Originator:
**Three Marketiers, LLC**

By: _____
Name: Carol Delgado
Title:   President and CEO

Buyer:
**RAMCO Holdings, LLC.**

By: _____
Name: Brent Houck
Title:   Executive Vice President

13

**Exhibit I**

Definitions

This is Exhibit I to the Agreement (as hereinafter defined). As used in the Agreement and the Exhibits, Schedules and Annexes thereto, capitalized terms have the meanings set forth in this Exhibit I (such meanings to be equally applicable to the singular and plural forms thereof). If a capitalized term is used in the Agreement, or any Exhibit, Schedule or Annex thereto, and not otherwise defined therein or in this Exhibit I, such term shall have the meaning assigned thereto in Exhibit I to the Purchase Agreement.

"Agent" has the meaning set forth in the Preliminary Statements to the Agreement.

"Agreement" means the Receivables Sale Agreement, dated as of September 2, 2016, between Originator and Buyer, as the same may be amended, restated or otherwise modified.

"Authorized Officer" means, with respect to Originator, its corporate president, secretary, controller, treasurer or chief financial officer or any vice president.

"Business Day" means any day on which banks are not authorized or required to close in Chicago, Illinois and The Depository Trust Company of New York is open for business.

"Buyer" has the meaning set forth in the preamble to the Agreement.

"Calculation Period" means each "Reporting Period" (as defined in the Purchase Agreement) or portion thereof which elapses during the term of the Agreement. The first Calculation Period shall commence on the date of the Purchase of Receivables hereunder and the final Calculation Period shall terminate on the Termination Date.

"Conduit" has the meaning set forth in the Preliminary Statements to the Agreement.

"Discount Factor" means at any time a percentage calculated to provide Buyer with a reasonable return on its investment in the Receivables after taking account of (i) the time value of money based upon the anticipated dates of collection of the Receivables and the cost to Buyer of financing its investment in the Receivables during such period and (ii) the risk of nonpayment by the Obligors. Originator and Buyer may agree from time to time to change the Discount Factor based on changes in one or more of the items affecting the calculation thereof, provided that any change to the Discount Factor shall take effect as of the commencement of a Calculation Period, shall apply only prospectively and shall not affect the Purchase Price payment in respect of the transfer of Receivables hereunder which occurred during any Calculation Period ending prior to the Calculation Period during which Originator and Buyer agree to make such change.

"Material Adverse Effect" means a material adverse effect on (i) the financial condition or operations of Originator, (ii) the ability of Originator to perform its

obligations under the Agreement or any other Transaction Document, (iii) the legality, validity or enforceability of the Agreement or any other Transaction Document, (iv) Originator's, Buyer's, the Agent's or any Purchaser's interest in the Receivables generally or in any significant portion of the Receivables, the Related Security or Collections with respect thereto, or (v) the collectability of the Receivables generally or of any material portion of the Receivables.

     "Originator" has the meaning set forth in the preamble to the Agreement.

     "Permitted Liens" means undetermined, inchoate or statutory deemed trust and/or liens imposed or potentially imposed by application of Law for source deductions, employee claims, taxes or other governmental assessments, charges or levies (i) of which notice has not yet been given or which have not at the relevant time been filed or registered in accordance with applicable Law, or (ii) that are not yet past due or that are being contested in good faith by appropriate proceedings.

     "Potential Termination Event" means an event which, with the passage of time or the giving of notice, or both, would constitute a Termination Event.

     "Purchase" means the purchase under the Agreement by Buyer from Originator of the Receivables, the Related Security and the Collections related thereto, together with all related rights in connection therewith.

     "Purchase Agreement" has the meaning set forth in the Preliminary Statements to the Agreement.

     "Purchase Price" means, with respect to the Purchase, the aggregate price to be paid by Buyer to Originator for such Purchase in accordance with Section 1.2 of the Agreement for the Receivables, Collections and Related Security being sold to Buyer on such date, which price shall equal, with respect to any Receivables, (i) the product of (x) the aggregate Original Balance of such Receivables, multiplied by (y) one minus the Discount Factor then in effect, minus (ii) any Purchase Price Credits remaining to be credited against the Purchase Price otherwise payable in accordance with Section 1.3 of the Agreement.

     "Receivable" means all indebtedness and other obligations owed by an Obligor to Originator which does not arise as a result of the provision of services to the Obligor, whether constituting an account, contract right, payment intangible, promissory note, chattel paper, claim, instrument document, investment property, financial asset or general intangible, arising in connection with the sale of goods by Originator and further includes, without limitation, the obligation to pay any Finance Charges with respect thereto. Indebtedness and other rights and obligations arising from any one transaction, including, without limitation, indebtedness and other rights and obligations represented by an individual invoice, shall constitute a Receivable separate from a Receivable consisting of the indebtedness and other rights and obligations arising from any other transaction; provided further, that any indebtedness, rights or obligations referred to in the immediately preceding sentence shall be a Receivable regardless of whether the Obligor or Originator treats such indebtedness, rights or obligations as a separate payment obligation.

"Termination Event" has the meaning set forth in Section 4.1 of the Agreement.

"Transaction Documents" means, collectively, the Purchase Agreement, this Agreement, each Collection Account Agreement and all other instruments, documents and agreements executed and delivered in connection herewith.

All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles.

## AMENDMENT NO. 1
## To Receivables Purchase Agreement Dated 9-2-16

By and between Three Marketiers, LLC ("Originator') and Ramco Holdings, LLC ("Buyer"):

1. ~~Section 1.1(b)(ii) is deleted as Buyer does assume obligations of~~ Originator regarding Receivables as between Obligors and Originator.

2. Section 1.2(b) and (c) is deleted as there are no Receivables coming into existence for Originator as Buyer assumes and is assigned all obligations between Obligors and Originator.

3. Section 1.4 is deleted.

4. Section 1.6 is deleted.

5. Section 3.2 is deleted.

6. Section 4.1(d), (e), (f) and (g) are deleted.

7. Section 4.2 is deleted except to the extent that Buyer and Originator are entitled to all rights and remedies available at law and equity.

All remaining terms and conditions remain in full force and effect and the effective date of this Amendment No. 1 is as of 9-2-16.

Originator:
Three Marketiers, LLC

By: _____
Carol Delgado
Title: President and CEO

Buyer:
Ramco Holdings, LLC

By: _____
Brent Houck
Title: Executive Vice President